No. 40,520

ALBERT BINDER, LAWRENCE CALDWELL, JIM DAVENPORT, LAWRENCE EINHAUS, IRL EPPLER, JUAN ESPARZA, ROGER A. MYERS, DAVID HASKER, ANDREW HERRMAN, ELMER HERRMAN, GILBERT HERRMAN, ROY D. LANGLEY, LAWRENCE NIGHTINGALE, I. V. NORWOOD, JOE SANDOVAL, DON RIDER, BRUCE JOHNSON, ERNEST W. SHANNON, LLOYD E. STEERMAN, ROBERT STREIT, LELAND SUTTON, RONALD G. SUTTON, EMERY WAYNE TURNER, GERALD B. WEBB, FRANK JACOBS, DONALD JANSSEN, ELDON JANSSEN, OSCAR KING and GARY WEBB, *Appellees*, v. THE CONSTRUCTION AND GENERAL LABORERS LOCAL UNION NO. 685, OF SALINA, KANSAS, an unincorporated association; WILLIAM SCHOLL and C. S. HARPER, as individuals and as officers and members of said Union and representative of the class of members thereof; JOHN DOE and RICHARD ROE, as individuals and as officers, representatives, and members of said Union whose names and addresses are unknown and representative of the class thereof, *Appellants*.

(317 P. 2d 871)

Opinion filed October 5, 1957.

*George E. McCullough, Robert L. Kimbrough* and *Leon W. Lundblade,* of Topeka, were on the briefs for appellants.

*Thomas M. Lillard, Jr.,* of Salina, argued the cause; *C. L. Clark* and *James P. Mize,* of Salina, were with him on the briefs for appellees.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal in equity from an order of the trial court granting an injunction, both temporary and permanent, against picketing for organizational purposes.

The appellees (hereafter plaintiffs) are twenty-nine individual

nonunion workmen who were employed by Jarvis Construction Company (hereafter Jarvis), prime contractor, in the construction of a Fine Arts Building at Marymount College in Salina, Kansas. The plaintiffs are all of Jarvis' employees on the job except two.

The appellants (defendants below) are The Construction and General Laborers Local Union No. 685, of Salina, Kansas, an unincorporated association, William Scholl and C. S. Harper (as individuals and as officers) and members of the said Union, for convenience hereafter collectively referred to as the Union (Local No. 685) or defendants.

The parties stipulated that the evidence and testimony submitted on the hearing for a temporary injunction be considered by the court in its determination as to whether or not a permanent injunction should issue. The defendants interposed a demurrer to the evidence of the plaintiffs and the trial court took the ruling under advisement requesting briefs and suggested conclusions of fact and conclusions of law. The defendants then rested their cause without presenting any evidence or testimony other than a stipulation entered into by counsel for the parties subject to objection of the plaintiffs that the facts stipulated were irrelevant and immaterial to the action.

The trial court overruled the demurrer to the evidence and granted both the temporary and permanent injunctions in accordance with conclusions of fact and conclusions of law entered July 26, 1956. Without filing a motion for new trial the defendants appealed from the judgment, rulings, findings, decisions and orders made on July 26, 1956, specifying as error:

"1. Overruling of defendants' Demurrer to Evidence.

"2. That the judgment is against the weight of the evidence, and considering all of it to be true, the judgment is erroneous as a matter of law."

When evidence is attacked by demurrer, the court must accept all of the evidence as true, give it the benefit of all inferences that may be properly drawn therefrom, consider only such portions thereof as are favorable to the party adducing it, disregard that which is unfavorable, and weigh no contradictory part or differences between direct and cross-examination, and if so considered there is any evidence in the record before this court which sustains plaintiffs' case, the demurrer must be overruled. (*Balin v. Lysle Rishel Post No. 68*, 177 Kan. 520, 280 P. 2d 623; *Brent v. McDonald*, 180

Kan. 142, 300 P. 2d 396; and *Hamilton v. Ferguson,* 181 Kan. 474, 312 P. 2d 232.)

Under the foregoing rules the evidence establishes that:

(1) Jarvis was the prime contractor on a Fine Arts Building at Marymount College located in Salina, Kansas, which was in the process of construction on May 23, 1956.

(2) The plaintiffs are twenty-nine individual nonunion workmen employed by Jarvis on the Marymount construction project. They are all of Jarvis' employees on this project except two, thus comprising a substantial majority. Some are masons and the remainder are mason tenders or common laborers. All are properly subject to organization, except that the masons are not eligible to join the defendants (Local No. 685).

(3) The plaintiffs are gainfully employed in a lawful business, conducted by Jarvis, for the purpose of earning a livelihood for themselves and their families. They desired to continue in their work with an employer who desired to continue their services.

(4) The construction project at Marymount College, in addition to Jarvis' employees, involved gypsum deck installation men, metal lathers, plumbers, electricians, sheet metal men, glaziers and carpenters, who were employed by subcontractors and other prime contractors on the Marymount project, other than Jarvis. These workmen were all union tradesmen. None were members or affiliated with the defendants (Local No. 685).

(5) The Union (Local No. 685) established a picket line, by placing one picket with a banner reading:

"Laborer Employees of Jarvis Construction Co. are invited to join Laborers Local Union No. 685 to obtain & help maintain union wages & working conditions. Labor Local No. 685, 148½ S. Santa Fe, Salina, Kansas, Phone 70077"

at the Marymount College construction site on May 23, 1956, at 7:30 in the morning. The picket was left on until 4:30 in the afternoon. This routine of picketing was repeated each working day until June 5, 1956.

(6) The purpose of the picketing conducted by the Union (Local No. 685) was to organize the nonunion employees of Jarvis, ultimately to have Jarvis enter into collective bargaining and negotiations with the Union (Local No. 685).

(7) The picketing has at all times been peaceful picketing by the same individual, an employee of the Union (Local No. 685)

and in no way associated or affiliated with any employer or other Union having workmen on the Marymount construction project, thus properly termed *stranger* picketing.

(8) The immediate effect and result of the picket line was that all union personnel refused to work on the Marymount project. Jarvis' foreman testified:

".   .   . All of the union workmen reported for work on May 23, 1956 and appeared to be ready to go to work at that time. When they saw the picket up there they looked around and they talked it over among themselves and they all left. Union carpenters, roofers, metal lathers, electricians and plumbers were there and none of them went to work. The only work that continued on the job was the brick work and common labor work. None of those men are in the union. No union men worked after May 23, 1956, the day upon which the picket line was put up, until the day the picket was removed."

(9) Without the work of the union men (carpenters, electricians, plumbers, and other skilled craftsmen, who worked for subcontractors), all of them still having some work to do on the project after May 22, 1956, the job gradually slowed and came to a halt on June 5, 1956. Efforts of Jarvis to get union men to come to work while the picket line was maintained were unsuccessful.

(10) On June 4, 1956, plaintiffs caused to be served on the Union (Local No. 685) a written demand which reads in part:

"There will be no more work for any of said workers to do as of Tuesday, June 5, 1956, since their particular work can no longer progress until certain electrical roofing, and other integral work is done. The workers in the related and integral trafts [crafts] refuse to cross the picket line which you have established and are maintaining on that job. Although the workers whom we represent have been and will continue to cross that picket line, they do not now have jobs available for the reason above stated, which is resulting in irreparable injury to these designated persons.

"In view of the fact that your picket line is depriving them of the right to work and to earn a living for themselves and for their families, demand is hereby made upon you that the picket line be permanently withdrawn on or before 8:00 o'clock a. m. Tuesday, June 5, 1956."

This notice and demand was ignored by the Union (Local No. 685) and picketing continued until enjoined by the trial court on June 5, 1956.

(11) The trial court's temporary restraining order of June 5, 1956, was promptly obeyed by the Union (Local No. 685) and the union tradesmen affiliated with other labor organizations, who were em-

ployed by the subcontractors and other prime contractors, resumed work.

(12) No labor dispute or controversy of any kind existed on May 23, 1956. There was no labor dispute or controversy between Jarvis and any of his employees (plaintiffs), concerning terms or conditions of employment, or between Jarvis and the Union (Local No. 685), concerning the right or process or details of collective bargaining, or concerning the designation of bargaining representatives. Further, there was on said date no labor dispute or controversy between plaintiffs and the Union (Local No. 685), in that none are now or ever have been members of the Union (Local No. 685) and none have been approached by the Union (Local No. 685) and personally solicited as members.

(13) The established policy and tradition of unions and union workmen is that they will not cross any picket line to enter their working site.

No question arises as to whether jurisdiction of the case lies in the Federal or State courts. This aspect of the case will be dealt with later in the opinion.

The immediate questions presented are: Does the Kansas law prohibit peaceful picketing for organizational purposes under the circumstances of this case? If this question is answered in the affirmative, is such picketing protected under the "free speech" provision of the Federal Constitution?

Applicable Kansas statutes provide for the rights of employees, define the unlawful acts of an employer, or any other person, and provide that which is against the public policy of this state.

G. S. 1949, 44-803, provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection, *and such employees shall also have the right to refrain from any or all such activities*." (Emphasis added.)

G. S. 1955 Supp., 44-808, provides in part:

"It shall be unlawful for *any employer*

"(1) *To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 44-803 of the General Statutes of 1949: Provided, however,* That no provision of this act shall be so construed as to deprive that employer of his right of 'free speech' as guaranteed by both the state and federal constitutions." (Emphasis added.)

G. S. 1955 Supp., 44-809, provides in part:

"It shall be unlawful for *any person*

. . . . . . . . . . . . . .

"(12) *To coerce or intimidate any employee in the enjoyment of his legal rights, including those guaranteed in section 44-803 of the General Statutes of 1949,* or any acts amendatory thereof or supplement thereto, or to intimidate his family, picket his domicile or injure the person or property of such employee or his family or to in any way discriminate against any employee, member of a labor organization or other person by reason of his exercise of any right guaranteed to him by the provisions of this act." (Emphasis added.)

G. S. 1949, 44-813, provides:

"Except as specifically provided in this act, nothing therein shall be construed so as to interfere with or impede or diminish in any way the right to strike *or the right of individuals to work;* nor shall anything in this act be so construed as to invade unlawfully the right to freedom of speech." (Emphasis added.)

Before turning to the precise issues there are additional facts to be gathered from the evidence or inferred therefrom which should be discussed.

The evidence concerning which there is no conflict in the record discloses that the picketing in the instant case was peaceful and effective. The picket line in a sense is a wall erected between Jarvis' construction site at Marymount College and the public. It is clear from the evidence that the union members, employed by the trades and crafts supplying a component part of the construction of the Fine Arts Building at Marymount College, both in labor and materials, refused to cross the picket line, individually adhering to the "traditional policy" of union members.

The responsible officers and agents of the Union (Local No. 685) were fully aware of the established union policy and tradition and had every reasonable opportunity to know, therefore must be presumed to have known, that the picketing would and did result in bringing construction work to a standstill, and that as a result of said picketing the plaintiffs would be and were thrown out of their chosen work on June 4, 1956, and continuously thereafter until the picket was removed by the restraining order of the district court on June 5, 1956.

There is no evidence that the Union (Local No. 685) attempted any organizational activities with plaintiffs or that Jarvis in any way interfered. Except for this action brought by the plaintiffs

against the Union (Local No. 685) there was no interference whatever with the Union by Jarvis or the plaintiffs.

The plaintiffs, as the nonunion employees of Jarvis, desired to continue in their employment with Jarvis in their nonunion status so that they might fully enjoy their right to work in freedom and thereby provide a means of livelihood for themselves and their families.

There is no grievance existing between Jarvis and the plaintiffs relating to wages, hours and conditions of employment. On the record the grievance, if it may be called a grievance, of the Union is not with Jarvis, but with the plaintiffs for not joining the Union (Local No. 685). *We are here concerned with picketing solely for organizational purposes.* This was firmly established by the plaintiffs in calling Mr. C. S. Harper, employed as a business agent for the Union (Local No. 685), an adverse witness, to testify in their behalf. He stated that the purpose of this picket was to organize the laborers on the Jarvis construction project at Marymount College; that the organizational banner carried by the picket was designed to organize the men and that the purpose of Local Union No. 685 was to take care of the laborers, organize the laborers on construction projects. Our question remains whether the Union (Local No. 685) may press for its immediate purpose of seeking to organize the nonunion employees of Jarvis, plaintiffs herein, by peaceful picketing at the Marymount construction project.

In our view peaceful picketing for organizational purposes under all of the facts and circumstances herein presented is unlawful under the Kansas law, and may be enjoined. We shall first approach this problem from the "labor-relations" principle as distinguished from the "free speech" principle of picketing. Although there is no dispute between Jarvis and the plaintiffs, they being its employees, yet the employer under the Union's theory may be subjected to irreparable loss from work directed in terms to the persuasion of nonunion employees to join a union. This peaceful picketing generates a coercive force to secure new members for the Union. It is apparent that this force is applied to the employer to urge his employees to join the Union to save his business, and to the employees to join the Union to save their livelihood.

The Union in reaching for the employees applies a steady and exacting pressure upon the employer to interfere with the free choice of the employees in the matter of organization. To say that

picketing is not designed to bring about such action is to be completely oblivious to an obvious purpose of picketing—to cause economic loss to the business during non-compliance by the employees with the requests of the Union.

On all the facts and circumstances presented by this record, one would be credulous, indeed, to believe that the Union had no thought of coercing the employer to interfere with its employees in their right to join or refuse to join the Union (Local No. 685). We have not the slightest doubt that it was the hope of the Union that the presence of pickets at Marymount College would interfere with the construction of the Fine Arts Building at Marymount College and eventually bring the progress of the work to a standstill, just as the evidence discloses that it did.

We now turn to the Kansas statute (44-803, *supra*) protecting the worker in his unquestioned right to organize, join or assist labor organizations to bargain collectively and to refrain from any and all such activities. The employer may neither interfere or coerce his employees nor be compelled to interfere or coerce his employees in matters of organization (44-808, *supra*). He cannot lawfully stop his loss by reason of the strangulation of work progress from picketing by denying full freedom of association to his employees. The freedom to associate of necessity by the terms of the statute means as well freedom not to associate.

The same prohibitions are applicable to "any person" within the meaning of 44-809, *supra*. We see no reason why a labor union and its officials or agents, as here, are not included within the definition of the term "any person." Even though the organization sought by the Union may be in the best interests of the employee, it yet remains his choice whether to associate with a union by joining or not to associate by refusing to join. The employee may have no desire for union affiliation or he may have a preference for a union other than the defendant Union (Local No. 685). In either case the choice rests with the employee. The freedom of the employee thus remains a reality.

The employee cannot escape a share of the irreparable damage which inevitably results to the business on which his livelihood depends. Irreparable damage to the employer must in any appreciable period be like damage to the employee. The Union says in substance to the twenty-nine nonunion workers (plaintiffs herein):

"Join Local No. 685 which we invite you to join or we will continue to harm the business in which you are employed."

The picketing is an act of interference with the employee in the exercise of his personal rights. It is a coercive force directed by the Union against the employee. This conduct violates the language and the purpose of 44-809, *supra*, and it is unlawful.

Under all the facts and circumstances presented by the record in this case, tested by rules applicable on demurrer, we find that the picketing of the Marymount College construction site has been conducted for the purpose of coercing, intimidating and inducing Jarvis to coerce or intimidate plaintiffs to become members of Local No. 685, and for the purpose of injuring Jarvis in its business because of its refusal to in any way interfere with the rights of plaintiffs to join or not to join a labor organization. We further find that the picketing of the Marymount College construction site has been conducted by the Union (Local No. 685) for the purpose of coercing or intimidating the plaintiffs to become members of said Union, and for the purpose of injuring the plaintiffs in their right to work and earn a livelihood because of their refusal to join said Union. Both of these union objectives are unlawful under Kansas law and we do not hesitate to declare that plaintiffs, about to be driven out of employment, are real parties in interest and aggrieved.

A union may reach and persuade the employee to join without directly touching or affecting the interests of the employer. There is no evidence in the record that any efforts were made by the Union in this direction with plaintiffs.

The foregoing factual situation is presented in *Vogt, Inc., v. International Brotherhood,* 270 Wis. 315, 71 N. W. 2d 359, (rehearing, 74 N. W. 2d 749) on writ of certiorari to the Supreme Court of Wisconsin in *Teamsters Union v. Vogt, Inc.,* 354 U. S. 284, 77 S. Ct. 1166, 1 L. Ed. 2d 1347, decided June 17, 1957, where state action which enjoined peaceful picketing was sustained. In *Vogt* the Supreme Court of the United States restated the principles governing this case in its most recent pronouncement on the subject. It gives perspective to a changing philosophy. In justification of the position taken the court said:

"It is inherent in the concept embodied in the Due Process Clause that its scope be determined by a 'gradual process of judicial inclusion and exclusion,' *Davidson v. New Orleans,* 96 U. S. 97, 104. Inevitably, therefore, the doctrine of a particular case 'is not allowed to end with its enunciation and . . . an expression in an opinion yields later to the impact of facts unforeseen.' *Jaybird Mining Co. v. Weir,* 271 U. S. 609, 619 (Brandeis, J., dissenting). It is not too surprising that the response of States—legislative and judicial—to

use of the injunction in labor controversies should have given rise to a series of adjudications in this Court relating to the limitations on state action contained in the provisions of the Due Process Clause of the Fourteenth Amendment. It is also not too surprising that examination of these adjudications should disclose an evolving, not a static, course of decision."

At the time the instant case was argued it was chronologically impossible for counsel to have the benefit of the *Vogt* case. Therefore, to burden this opinion extensively with cases cited by council for the parties is unwarranted.

In *Vogt* both court and dissenting opinion undertake masterfully to discuss and classify many of the cases on this subject. They include *Truax v. Corrigan,* 257 U. S. 312, 42 S. Ct. 124, 66 L. Ed. 254; *Senn v. Tile Layers Union,* 301 U. S. 468, 57 S. Ct. 857, 81 L. Ed. 1229; *Thornhill v. Alabama,* 310 U. S. 88, 60 S. Ct. 736, 84 L. Ed. 1093; *Drivers Union v. Meadowmoor Co.,* 312 U. S. 287, 61 S. Ct. 552, 85 L. Ed. 386; *A. F. of L. v. Swing,* 312 U. S. 321, 61 S. Ct. 568, 85 L. Ed. 855; *Carpenters Union v. Ritter's Cafe,* 315 U. S. 722, 62 S. Ct. 807, 86 L. Ed 1143; *Bakery Drivers Local v. Wohl,* 315 U. S. 769, 62 S. Ct. 816, 86 L. Ed. 1178; *Cafeteria Union v. Angelos,* 320 U. S. 293, 64 S. Ct. 126, 88 L. Ed. 58; *Giboney v. Empire Storage Co.,* 336 U. S. 490, 69 S. Ct. 684, 93 L. Ed. 834; *Hughes v. Superior Court,* 339 U. S. 460, 70 S. Ct. 718, 94 L. Ed. 985; *Teamsters Union v. Hanke,* 339 U. S. 470, 70 S. Ct. 773, 94 L. Ed. 995; *Building Service Union v. Gazzam,* 339 U. S. 532, 70 S. Ct. 784, 94 L. Ed. 1045; *Plumbers Union v. Graham,* 345 U. S. 192, 73 S. Ct. 585, 97 L. Ed. 946; and *People v. Charles Schweinler Press,* 214 N. Y. 395, 108 N. E. 639, 28 Harv. L. Rev. 790.

The issue presented by this case is also *Pappas v. Stacey and Winslow,* 151 Me. 36, 116 A. 2d 497, where on appeal to the Federal Supreme Court the appellee's motion to dismiss for lack of a substantial federal question was granted (*Stacey et al. v. Pappas,* 350 U. S. 870, 76 S. Ct. 117, 100 L. Ed. 770).

The union contends that peaceful picketing described in the instant case is protected under the "free speech" provision of the Federal Constitution.

In *Vogt, Inc., v. International Brotherhood,* supra, the Wisconsin Supreme Court on rehearing said:

". . . We gave insufficient notice to the fact that free speech is not the only right secured by our fundamental law, and that it must be weighed, here for instance, against the equally important right to engage in a legitimate business free from dictation by an outside group, and the right to protection against

*unlawful conduct which will or may result in the destruction of a business; that both the right to labor and the right to carry on business are liberty and property.* We left out of calculation the rule that the court is to consider not only the established facts as they appear in the record, but that it should also give attention to the inferences reasonably and justifiably to be drawn therefrom." (p. 321b.) (Emphasis added.)

In *Vogt* the United States Supreme Court answered the "free speech" argument of the Union by reviewing decisions (*Bakery Drivers Local v. Wohl,* supra; *Carpenters Union v. Ritter's Cafe,* supra; *Giboney v. Empire Storage Co.,* supra; *Hughes v. Superior Court,* supra; *Teamsters Union v. Hanke,* supra; *Building Service Union v. Gazzam,* supra; and *Plumbers Union v. Graham,* supra) leading to the conclusion that:

"This series of cases, then, established a broad field in which a State, in enforcing some public policy, whether of its criminal or its civil law, and whether announced by its legislature or its courts, could constitutionally enjoin peaceful picketing aimed at preventing effectuation of that policy." (p. 293.)

The court then said:

". . . In this case, the circumstances set forth in the opinion of the Wisconsin Supreme Court afford a rational basis for the inference it drew concerning the purpose of the picketing . . . that the picketing was for the purpose of coercing the employer to coerce his employees . . ." (p. 295.)

While picketing is a mode of communication, it is inseparably something more and different.

". . . [Industrial picketing] is more than free speech, since it involves patrol of a particular locality and since *the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated* . . ." (Mr. Justice Douglas, joined by Black and Murphy, JJ., concurring in *Bakery Drivers Local v. Wohl,* supra, p. 776.) (Emphasis added.)

". . . Publication in a newspaper, or by distribution of circulars, may convey the same information or make the same charge as do those patrolling a picket line. *But the very purpose of a picket line is to exert influences, and it produces consequences, different from other modes of communication. The loyalties and responses evoked and exacted by picket lines are unlike those flowing from appeals by printed word* . . ." (*Hughes v. Superior Court,* supra, p. 465.) (Emphasis added.)

". . . But since picketing is more than speech and establishes a *locus in quo* that has far more potential for inducing action or nonaction than the message the pickets convey, this Court has not hesitated to uphold a state's restraint of acts and conduct which are an abuse of the right to picket rather than a means of peaceful and truthful publicity. . . ." (*Building Service Union v. Gazzam,* supra, p. 537.)

In the instant case the message which the banner bore in its fine print was insignificant. Certainly, after June 4, 1956, when the demand was served upon the defendants the message carried upon the banner could not possibly have been intended for the enlightenment of the plaintiffs.

In view of the foregoing authorities, we hold that peaceful picketing under the facts and circumstances of the instant case is not protected under the "free speech" provision of the Federal Constitution, since its purpose is unlawful and contrary to the public policy expressed by the legislature of Kansas.

The employees of Jarvis, casting about for a mode of continuing their work to earn a livelihood in the face of what they conceived to be an unlawful act, filed their action against the Union. We have found no case in this jurisdiction, nor have we been cited to any, in which a suit was brought by employees to restrain the Union as in the instant case. While this may appear to be a novelty, this procedure is authorized by G. S. 1955 Supp., 44-814, which provides:

*"Any person violating the provisions of this act* shall not be guilty of a criminal offense except as otherwise provided by law, but *may be enjoined by* the attorney general or the county attorney of the proper county or *any aggrieved party* from violating the provisions thereof *by action in the district court* of the proper county." (Emphasis added.)

Clearly under the statute, the plaintiffs are the "aggrieved" and the Union is embraced within the term "any person" violating the provisions of the act. The State of California has held an action by the employees against the union proper. (*McKay v. Retail Auto. S. L. Union No. 1067,* 16 Cal. 2d 311, 106 P. 2d 373; [writ of certiorari denied, 313 U. S. 566, 61 S. Ct. 939, 85 L. Ed. 1525].)

We conclude that the trial court properly overruled the demurrer to the evidence of the plaintiffs.

Turning our attention to the defendants' second specification of error, it must be emphasized that an appeal was taken by the defendants from the judgment of the trial court, entered pursuant to submission of the case as heretofore stated, *without filing a motion for new trial.*

This court has held on numerous occasions that where the trial court has made findings of fact and conclusions of law thereon, which either included or indicated a judgment, the same were not subject to review on appeal in the absence of a motion for new trial,

lacking which the only question left was the sufficiency of the findings and conclusions to support the judgment. (*Arnall v. Union Central Life Ins. Co.*, 157 Kan. 535, 142 P. 2d 838; and *Smith v. Kansas Transport Co.*, 172 Kan. 26, 238 P. 2d 553.) An analogous rule is indicated where appeal is taken from the ruling of the trial court overruling the motion for new trial, but the ruling is not specified as error. (*McIntyre v. Dickinson*, 180 Kan. 710, 307 P. 2d 1068, and cases cited therein.)

The result is that defendants' specification of error—challenging the judgment as against the weight of evidence, and considering all of it to be true, that the judgment is erroneous as a matter of law—presents nothing for appellate review.

Are the findings and conclusions sufficient to support the judgment? The trial court in announcing its judgment on July 26, 1956, incorporated sixteen findings of fact, which it denominated "Conclusions of Fact" and eight conclusions of law. The findings of fact are similar in all respects to those heretofore indicated in reviewing the evidence on demurrer. The trial court's finding No. 13 reads:

"The court finds and believes that certainly from the moment of the service of plaintiffs' Exhibit 3 on June 4, 1956, upon defendant Local Union No. 685 and its responsible officers and agent, the aim, purpose, and objective of defentant Local Union No. 685, its members, William Scholl, its President, and C. S. Harper, its business agent, in maintaining said picketing, was to thereby deprive plaintiffs of their right to work for Jarvis Construction Company on said construction project."

When considered in connection with all other findings made by the trial court, we regard this finding as equivalent to a finding that the aim, purpose and objective of the Union (Local No. 685) was to coerce or intimidate the plaintiffs to become members of the Union (Local No. 685) and to injure the plaintiffs in their right to work and earn a livelihood because of their refusal to join said Union.

The general import of the trial court's conclusions was that the plaintiffs had no adequate remedy at law against an imminent, irreparable injury resulting from picketing which the trial court characterized as *unlawful*. Accordingly, judgment was entered permanently enjoining the defendants from further injuring plaintiffs by picketing. The findings made by the trial court and the general conclusion based thereon are sufficient to support the judgment.

It matters not that some of the reasons given by the trial court in arriving at its general conclusion may have been erroneous.

Where the judgment rendered by the trial court is supported by the facts in the case, and must necessarily have been rendered under the law on the facts presented, it will not be reversed because the trial court adopted a wrong theory of the law, and based its judgment on such erroneous theory. (*Scattergood v. Martin*, 57 Kan. 450, 46 Pac. 935; *Saylor v. Crooker*, 97 Kan. 624, 156 Pac. 737; *La Harpe Farmers Union v. United States F. & G. Co.*, 134 Kan. 826, 8 P. 2d 354; and *Foster v. City of Augusta*, 174 Kan. 324, 256 P. 2d 121.)

One other point merits consideration. It is apparent from defendants' presentation of the case that reliance is placed upon an attack against State court jurisdiction.

This is founded upon the contention that, if an unfair labor practice has been committed, it affects interstate commerce, a field in labor relations matters which has been pre-empted by Congress.

If, on the record presented to this court in the instant case, the picketing affects interstate commerce, there can be no doubt but that exclusive jurisdiction has been vested by Congress in the National Labor Relations Board to determine such labor dispute under recent decisions. (*Guss v. Utah Labor Board*, 353 U. S. 1, 77 S. Ct. 598, 1 L. Ed. 2d 601; *Meat Cutters v. Fairlawn Meats*, 353 U. S. 20, 77 S. Ct. 604, 1 L. Ed. 2d 613; *Friesen v. General Team & Truck Drivers Local Union No. 54*, 181 Kan. 769, 317 P. 2d 366; Case No. 40,247, decided this date; and *Asphalt Paving v. Local Union*, 181 Kan. 775, 317 P. 2d 349; Case No. 40,282, decided this date.)

The defendants contend, by merely calling the trial court's attention to interstate commerce in connection with a labor relations matter before it, which is either protected or prohibited by the Labor Management Relations Act, 1947, that the State court should decline jurisdiction, citing *Amalgamated Meat Cutters, Etc. v. Johnson*, 178 Kan. 405, 286 P. 2d 182. A reading of that case reveals that there the National Labor Relations Board *had taken jurisdiction* by sending examiners into the field to investigate the merits, and the only purpose sought by an action in the district court was to procure a restraining order pending outcome of the matter before the Board which Ohse, the employer, had initiated. Clearly, this does not sustain defendants' position. There all parties admitted that the National Labor Relations Board had jurisdiction.

Prior to the submission of the case the parties entered into a stip-

ulation, heretofore mentioned, which was objected to by the plaintiffs as irrelevant and immaterial. This stipulation provided that Jarvis

". . . does at this time hold construction contracts with the United States Government involving projects at the Smoky Hill Air Force Base, the total contract price of which is approximately $330,000.00, and the terms of which contract obligate said contractor to finish said work within the term of the calendar year."

Apparently, it is this stipulation that has led the defendants to attack the jurisdiction of the State court. This stipulation in and of itself is not an admission by plaintiffs that interstate commerce is affected in the instant case. The construction project and the picketing in the instant case is at Marymount College. It is the employees on this project that are the plaintiffs. Jarvis is not a party to the action. Furthermore, the making of a contract in and of itself does not necessarily affect commerce. To ascribe the import to this stipulation which defense counsel seek, would require many additional facts. These facts must be presented in the form of *evidence*. Gratuitous statements made by counsel for defendants, allegations in an answer, statements in defendants' brief, and statements set forth in the notice of appeal are not entitled to the dignity of *evidence*. The stipulation, therefore, is irrelevant and immaterial; that the trial court so regarded the stipulation is apparent.

Whether the defendants' activities were within the jurisdiction of the trial court or were such as to empower the National Labor Relations Board "to prevent any person from engaging in any unfair labor practice . . . affecting commerce" (29 U. S. C. A. § 160 [a]), is a question of fact to be determined by the trial court. (*Asphalt Paving v. Local Union,* supra.) Whether interstate commerce is affected is a finding of fact upon which jurisdiction rests, and it must be determined from the *evidence* where State jurisdiction is challenged.

The trial court, without making a specific finding as to whether or not it had jurisdiction, did exercise state jurisdiction, and it must therefore be presumed that the trial court found that it had jurisdiction. In fact, no other conclusion could be reached since there is not one scintilla of *evidence* in the record before this court disclosing that interstate commerce is affected. In a recent case, *In re Estate of Snyder,* 181 Kan. 222, 310 P. 2d 944, this court upon motion of the appellee struck an abstract from the files of this court

wherein the appellant's version of the "evidence" was narrated from statements of counsel made in the trial court. In *State v. Brown*, 181 Kan. 375, 312 P. 2d 832, a conviction in a criminal case was reversed because a foundation for the admission of the transcript of testimony of an absent complaining witness, given at a prior hearing, did not consist of evidence. It was held that bare statements of counsel were not entitled to the dignity of evidence and did not constitute the proof required to establish a proper foundation. It must be remembered in the instant case that defendants presented no evidence, relying upon their demurrer to plaintiffs' evidence, and a submission of their case upon plaintiffs' evidence.

The confusion as to interstate commerce arises because the cases, summarized in *Vogt*, where the Supreme Court sustained a State court's injunction, do not even mention the matter let alone demonstrate a finding on it. That is often a void left by the State court's treatment of the matter. (*International Ass'n of Machinists, A. F. L. Local 924 v. Goff-McNair Motor Co.*, 223 Ark. 30, 264 S. W. 2d 48; *Hotel Restaurant Emp. & Bartenders Intern. Union, No. 522 v. Lambert*, 258 S. W. 2d 694 [Ky. 1953]; *Blue Boar Cafeteria Co. v. Hotel & Restaurant, etc.*, 254 S. W. 2d 335 [Ky. 1952]; and *Howard v. Haven*, 198 Tenn. 572, 281 S. W. 2d 480.)

A case similar in many respects to the case at bar is *Plumbers Union v. Graham*, supra (1953), where the State of Virginia had enjoined, as a violation of its "Right to Work" law, picketing which advertised that nonunion men were being employed on the construction of George Washington Carver School in the City of Richmond. The United States Supreme Court found there was sufficient evidence in the record supporting a conclusion that a substantial purpose of the picketing was to put pressure on the general contractor to eliminate nonunion men from the job and held that the injunction was not in conflict with the Fourteenth Amendment. No mention whatever is made in the decision concerning interstate commerce or the Labor Management Relations Act, 1947, and the case involves construction activity almost identical to that in the case at bar. Both concern construction of a school building with subcontractors employing union workmen where peaceful picketing resulting in work stoppage was enjoined by a State court.

We hasten to emphasize, however, that the instant decision is not based on a "common law right to work." (See, *Farnsworth &*

*Chambers Co. v. Local Union 429, Etc.,* 201 Tenn. ——, 299 S. W. 2d 8, Case No. 70,487, decided February 8, 1957, [reversed by *per curiam* decision, *Electrical Workers Local Union v. Farnsworth & Chambers Co.,* 353 U. S. 969, 77 S. Ct. 1056, 1 L. Ed. 2d 1133]; *Garner v. Teamsters Union,* 346 U. S. 485, 74 S. Ct. 161, 98 L. Ed. 228; *Weber v. Anheuser-Busch, Inc.,* 348 U. S. 468, 75 S. Ct. 480; 99 L. Ed. 546; *Smith v. General Motors Corporation,* 128 Ind. App. ——, 143 N. E. 2d 441; *Yeager v. Internat. Brotherhood Etc.,* 39 Wash. 2d 807, 239 P. 2d 318; *Weisenberger v. State,* 202 Ind. 424, 175 N. E. 238; *Railway Employes' Dept. v. Hanson,* 351 U. S. 225; 76 S. Ct. 714, 100 L. Ed. 1112; and *Looper v. Georgia, Southern & Florida Railway Co.,* 213 Ga. 279, 99 S. E. 2d 101.)

This court, finding substantial evidence to support the exercise of State jurisdiction in the instant case, and trusting the integrity of the trial court, sustains the jurisdiction which an arm of its judiciary exercised.

It is inconceivable that a labor dispute involving *local construction,* without any evidence that interstate commerce is affected, could be declared to affect interstate commerce as a matter of law. If the local character of a given construction project involving employers and employees engaged in the building trades is construed as a matter of law to affect interstate commerce on the ground that it is an integral part of a vast nation-wide construction industry, it would in effect wipe out the whole distinction between interstate and intrastate commerce. There would be no limit upon the power of the Federal Government to regulate the economy of the country in the most far-reaching details. (See, *Sperry v. Denver Bldg. & Const. Trades Council,* 77 F. Supp. 321 [Dist Ct., D. Colo., 1948].)

The judgment of the trial court is affirmed.