No. 41,209

J. G. WITMER, *Appellee*, v. the Estate of Frank C. Brosius, Deceased (JOHN R. BARRIER, Administrator), *Appellant*.

(336 P. 2d 455)

Opinion filed March 7, 1959.

*Richard Jones,* of Wichita, argued the cause, and *A. W. Hershberger, H. E. Jones, Wm. P. Thompson, Jerome E. Jones* and *Robert J. Roth,* all of Wichita, were with him on the brief for appellant.

*James W. Sargent,* of Wichita, argued the cause, and *W. D. Jochems, J. Wirth Sargent, Emmet A. Blaes, Roetzel Jochems, Robert G. Braden, J. Fran-*

cis *Hesse* and Stanley E. *Wisdom,* all of Wichita, were with him on the brief for appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is the second appearance of this action for appellate review. (See *Witmer v. Estate of Brosius,* 181 Kan. 200, 310 P. 2d 937.) The action originated in the probate court as a demand filed against the estate of Frank C. Brosius, deceased, (defendant-appellant) for money allegedly deposited with decedent as a down payment on a residential property to be constructed by O. A. Zimmerman, a building contractor. Thereafter, pursuant to G. S. 1955 Supp., 59-2402a, the cause was transferred to the district court, where issues were joined for trial. The first appeal was taken to this court from an order of the trial court sustaining a demurrer to the plaintiff's evidence. This court reversed, holding the evidence sufficient to make out a *prima facie* case against the defendant estate.

After retrial, wherein both parties presented evidence, judgment was entered generally in favor of J. G. Witmer (plaintiff-appellee), and against the estate of Frank C. Brosius, deceased, pursuant to findings of fact and conclusions of law made by the trial court. Appeal has been duly perfected from all adverse rulings presenting the following questions for review (quoting from appellant's brief):

"1. Did the plaintiff introduce any evidence to support the basic allegations of the Amended Petition in order to withstand a demurrer by the defendant?

"2. Did a trust relationship ever exist between the decedent, Frank C. Brosius, and J. G. Witmer?"

The former opinion was devoted entirely to the pleadings of the respective parties and to the evidence presented by the plaintiff below, J. G. Witmer, construed as on demurrer. At that time the same evidence was before this court as is now presented in the record. The appellant has called our attention to no change, nor does our review of the record indicate any material change. The trial court, after retrying the case, upon substantial evidence, found that the allegations of the petition were supported. Appellant would like this court to weigh the evidence. This is not the function of the appellate court. (*In re Estate of Guest,* 182 Kan. 760, 324 P. 2d 184; *Harrison v. Lyon,* 126 Kan. 705, 271 Pac. 395; and *Bruington v. Wagoner,* 100 Kan. 439, 164 Pac. 1057.) In view of this state of the record the answer to appellant's first question is

controlled by our former decision, that the evidence introduced by the plaintiff in the trial court in support of the basic allegations of the amended petition established a *prima facie* case and was sufficient to withstand a demurrer.

Likewise, the conclusion that plaintiff's evidence at the first trial was sufficient to make out a *prima facie* case inferentially recognized that recovery by J. G. Witmer was permissible from the estate of Frank C. Brosius, deceased, on some definite theory of law, such theory not being stated in the former opinion.

The remainder of this opinion will be devoted to the theory of law upon which recovery is permissible.

Upon retrial of the case the trial court made findings of fact, which in all material respects, were identical with the facts reported in the former opinion. The facts stated in the former opinion are therefore incorporated and made a part hereof by reference. (*Witmer v. Estate of Brosius*, 181 Kan. 200, 310 P. 2d 937.) In supplementing such facts, it may be stated, the trial court found that in November, 1952, some ten days after the death of Frank C. Brosius, J. G. Witmer went with O. A. Zimmerman to the Brosius office to purchase a fourplex at Hydraulic and Osie, in the City of Wichita. (Information that Witmer changed his mind concerning a duplex and desired to purchase a fourplex had been conveyed to Zimmerman who in turn conveyed the information to Brosius, while he was living, who offered no objection to the change.) Witmer then asked that the $9,500 be applied as a credit on the purchase of this fourplex, but was refused. Thereupon Witmer demanded the return of his $9,500 and this also was refused.

The following were the trial court's conclusions of law:

"1. Brosius accepted the $9,500.00 Witmer check from Zimmerman knowing that he was not to hold it as his own absolute property but was to apply the same for the benefit of Witmer as a credit at the time Witmer made his selection of a duplex. Brosius, having accepted the money with this understanding, held such money in trust for the benefit of Witmer.

"2. Payment by Witmer of the $9,500.00 and the receipt by Brosius of the said amount was not an independent loan either to Zimmerman or Brosius, but was an advancement made by Witmer in anticipation of receiving credit on a duplex which he was to select on a future date, all of which was known to Brosius, Zimmerman and Witmer at the time Brosius received the check.

"3. Such money was not so applied for the benefit of Witmer and has not been returned to him. Decedent's estate is therefore liable to Witmer in the amount of $9,500.00. Judgment is to be rendered generally in favor of Witmer and against the estate, with costs to be paid by the estate."

The first conclusion above is construed by the appellant as a ruling by the trial court that an express trust was created in favor of Witmer as *cestui que trust,* thus giving rise to the second question presented by the appellant.

Upon all the facts and circumstances presented by the evidence, appellant contends the three essential elements required to create an express trust have not been met, citing *Shumway v. Shumway,* 141 Kan. 835, 44 P. 2d 247; 89 C. J. S., Trusts, § 22, p. 734; and 1 Bogert, Trusts and Trustees, § 49, pp. 354, 355. It is further argued there was no confidential relationship between Witmer and Brosius, citing 89 C. J. S., Trusts, § 151d, p. 1070.

It is unnecessary to prolong this opinion by discussing the law applicable to express trusts. First, the trial court did not say an express trust was created since the language used in conclusion of law No. 1 can be consistently construed with the theory of a constructive or implied trust. Second, even if appellant's interpretation of the trial court's theory of the law were true, a correct decision for which an erroneous reason is given by the trial court is not ground for reversal. (*La Harpe Farmers Union v. United States F. & G. Co.,* 134 Kan. 826, 8 P. 2d 354.) It matters not that some of the reasons given by the trial court in arriving at its general conclusion may have been erroneous. Where the judgment rendered by the trial court is supported by the facts in the case, and must necessarily have been rendered under the law on the facts presented, it will not be reversed because the court adopted a wrong theory of the law, and based its judgment on such erroneous theory. (*Binder v. Local Union No. 685,* 181 Kan. 799, 317 P. 2d 371; and *Custom Built Homes Co. v. State Comm. of Rev. & Taxation,* 184 Kan. 31, 334 P. 2d 808.)

Upon all of the facts, conditions and circumstances presented by the record and the findings of the trial court, the theory of law upon which the appellee is entitled to recover is that of restitution, which involves quasi-contracts and constructive trusts. Recovery upon this theory was permitted in the case of *Black v. City of Lawrence,* 113 Kan. 518, 215 Pac. 297. There a firm of engineers sued the City of Lawrence for a sum of money and recovered a judgment from which the city took an appeal. Because of extraneous circumstances no actual agreement existed between the engineers and the City of Lawrence to pay this sum of money. Nevertheless, the engineers were permitted to recover upon a theory of law stated by the court as follows:

". . . The implication, if not one of fact, involving an actual intentional agreement on the part of the city, is one of law, based upon the duty of right conduct, resulting in a constructive or quasi contract. In the latter case the obligation arises 'not from consent, but from the law or natural equity,' and is imposed upon the ground that it is 'dictated by reason and justice,' and is 'allowed to be enforced by an action *ex contractu.*' (13 C. J. 244.) 'In one word, the gist of this kind of action [an action upon the case for money had and received to the plaintiff's use] is, that the defendant, upon the circumstances of the case, is *obliged by the ties of natural justice and equity to refund the money.*' (Lord Mansfield, speaking for the court, in *Moses v. Macferlan,* 2 Burr. 1005, 1012.) 'An action for money had and received is an equitable action, governed by equitable principles . . . All that plaintiff need show is that defendant holds money which, in equity and good conscience, belongs to him.' (27 Cyc. 849, 854.)" (p. 521.)

The quasi-contract principle must be distinguished from implied contracts. In the case of *In re Estate of Langdon,* 165 Kan. 267, 195 P. 2d 317, it was held that parties may be bound as firmly by implied contracts as by those expressed in words, oral or written. The law implies, from circumstances and the silent language of men's conduct and actions, contracts and promises as forcible and binding as those made by express words or through the medium of written memorials. It was further said upon the facts and circumstances there presented that a trust arose by implication of law. (On the question of implied contracts see, also, *Huffman v. Wilkes,* 140 Kan. 637, 37 P. 2d 988; and *Scherger v. Union National Bank,* 138 Kan. 239, 246, 25 P. 2d 588.)

Quasi-contracts are described in the Restatement of the Law, Contracts, § 5, p. 7, under Comment a, in the following language:

"Contracts are often spoken of as express or implied. The distinction involves, however, no difference in legal effect, but lies merely in .the mode of manifesting assent. Implied contracts must be distinguished from quasi-contracts, which also have often been called implied contracts or contracts implied in law. Quasi-contracts, unlike true contracts, are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice. Such obligations were ordinarily enforced at common law in the same form of action (assumpsit) that was appropriate to true contracts, and some confusion with reference to the nature of quasi-contracts has been caused thereby."

Restatement of the Law, Restitution, § 15, p. 61, which involves quasi-contracts and constructive trusts, reads:

"A person is entitled to recover money which he has paid another pursuant to the terms of a supposed contract with or offer from the other which, because of the payor's mistake of fact as to the existence of consent, of con-

sideration or of a required formality, he erroneously believed to exist, if he does not get the expected exchange."

Comment *(e)* under this section reads in part:

"The rule stated in this Section is applicable to a situation where one makes a payment to another in the mistaken belief that the, other has promised to assume a duty in return for or with reference to the payment. In such cases the payor is entitled to a return of his money upon disclaimer or a refusal of the other to perform, except where the payment has been made to create a trust for the benefit of a third person . . . If the payee undertakes the duty which the payor believed the payment would create, the right to restitution is terminated."

(See, also, 46 Am. Jur., Restitution and Unjust Enrichment, p. 99; and 17 C. J. S., Contracts, § 6, p. 322.)

The relationship of constructive trusts to quasi-contracts is clearly stated by Austin Wakeman Scott, reporter on trusts for the American Law Institute, in his treatise on the Law of Trusts:

"Then general principles with reference to unjust enrichment which are at the basis of constructive trusts and the analogous equitable remedies of equitable lien and subrogation are also at the basis of quasi-contractual obligations. The chief difference is that quasi-contractual obligations are ordinarily enforceable by an action at law, the purpose of which is to impose a personal liability upon the defendant; whereas the enforcement of a constructive trust is by a proceeding in equity to compel the defendant to surrender specific property. The distinction is procedural rather than substantive. For this reason it is believed that it is more logical to treat the subject of constructive trusts with the subject of quasi contracts rather than with the subject of trusts. At any rate, this was what was determined upon by the American Law Institute, and there has been no reason to think that the decision was unwise. It is true that the title 'Restitution' has no familiar ring in the ears of the American lawyer, who has been accustomed to deal with quasi contracts as a part of the law of contracts, which it very clearly is not, and to deal with constructive trusts as a part of the law of trusts, which, we believe, it is not. If procedure is less important than the substantive law, the reasons for the treatment of these subjects by the American Law Institute seem to be well founded. The overemphasis on procedure is the characteristic of primitive systems of law, and tends to disappear as the law becomes more mature." (4 Scott on Trusts, [2nd Ed.], § 461, p. 3101.)

An *equitable charge or lien* was said to be created for money advanced in *Atchison, T. & S. F. Ry. Co. v. Hurley,* 153 Fed. 503, and *Hurley v. Atchison, Topeka & Santa Fe Ry.,* 213 U. S. 126, 29 S. Ct. 466, 53 L. Ed. 729, where a coal company went into bankruptcy and the railroad company had advanced money for delivery of coal for the next month, contrary to its customary business practice, to enable the coal company to meet its payroll.

Under our civil code a cause of action founded upon principles of unjust enrichment is enforced by a civil action, the distinction between actions at law and suits in equity having been abolished by legislative enactment now appearing as G. S. 1949, 60-201.

The word "trust" is somewhat ambiguous in that it includes situations presented by an equitable proceeding to enforce an express trust and an equitable proceeding to prevent unjust enrichment. Thus, the trial court in using the word "trust" was sufficiently broad in its conclusion No. 1 to include a situation calling for recovery on the theory of constructive trust.

It has been said that an attempt to define or describe a constructive trust would be inadequate because such definition or description would be too narrow in its scope and fail to include important types of constructive trusts. It is frequently said that a constructive trust is imposed as a remedy for fraud, "But there are numerous situations in which a constructive trust is imposed in the absence of fraud, as for example in the case of mistake, or in the case of a profit made by a fiduciary even though he has not acted fraudulently, or in the case of an innocent donee of property in which another has an equitable interest. It is sometimes added that fraud may be 'constructive' as well as actual, which is merely an expression of the idea that a constructive trust may arise in the absence of fraud." (4 Scott on Trusts, [2nd Ed.], § 462, p. 3102.)

Judge Cardozo, speaking for the Court of Appeals of New York, has said, "A constructive trust is then the remedial device through which preference of self is made subordinate to loyalty to others." (*Meinhard v. Salmon*, 249 N. Y. 458, 467, 164 N. E. 545, 62 A. L. R. 1 [1928].) This is not and undoubtedly was not intended to be a definition of a constructive trust, since it includes only those which arise out of an abuse of a fiduciary relation. Judge Cardozo has also said, "A constructive trust is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." (*Beatty v. Guggenheim Exploration Co.*, 225 N. Y. 380, 386, 122 N. E. 378.) This would seem to be a more nearly complete description of a constructive trust. Constructive trusts are entirely independent of any actual or presumed intention of the parties.

Turning now to the facts in the instant case, it may be said the basis for recovery or restitution is *mistake of fact*, a mistaken belief

by Witmer in the existence of a contract with Brosius. The estate of Frank C. Brosius, deceased, was unjustly enriched by $9,500 on the mistaken belief by Witmer that he had a contract with Brosius whereby he was given credit on the books for $9,500 as a down payment on the purchase of a duplex to be selected in the future. After the death of Brosius, he first learned of the mistake, the fact that he had not been given credit on the books of Brosius, and that such books reflected only an application of his funds in payment of the loan Brosius advanced for payment of the Rogers-Emrich Lumber Company lots upon which Zimmerman constructed the duplexes.

The trial court found the business and accounting practices of Brosius were not comparable to the practices of other companies engaged in the mortgage loan business.

D. Clarence Unrau, a certified public accountant, was employed by Frank C. Brosius prior to his death sometime in 1950. He was engaged to set up books because Mr. Brosius did not have any in the commonly accepted sense of the term. He testified that by October, 1951, there was some improvement in the books, and:

"At that time his books were not acceptable even under the minimum standard. We had numerous conferences and he stated that he wished to co-operate with us and furnish the additional information required but he never did. Complete transactions during this period in many cases were not recorded, but transactions that involved dollars and cents coming in, or dollars and cents going out were being recorded. We had several conferences concerning the status of Oswald Zimmerman's account. The Zimmerman-Brosius accounts were in abominable shape. Mr. Brosius did not have a suspense account. If a man gave Mr. Brosius a down payment on a lot not yet selected, it would be a proper item to go into a suspense account. To qualify this answer, I would say the payment would be credited to the man's account or put in a suspense account. During this time, Mr. Brosius had no proper accounting procedure . . ."

This witness further testified that Mr. Brosius kept a lot of his business in his head.

In accordance with the evidence the trial court found that Brosius had but one checking account for both business and personal expenses, and that Brosius had requested Zimmerman to secure as many down payments as possible to assist the financing of the projects. The trial court further found:

"4. For some time prior to October 8, 1951, O. A. Zimmerman and Paul Zimmerman had had conversations with the plaintiff, J. G. Witmer, concerning the possible construction by Zimmerman for purchase by the plaintiff

of a duplex on one of seven certain lots in the Eastwood Village Addition to the City of Wichita. Zimmerman, prior to October 9, 1951, had informed Frank C. Brosius of the possibility of securing a down payment from the plaintiff.

"5. On October 9, 1951, the plaintiff made out a check to O. A. Zimmerman and Paul Zimmerman with the notation on the check 'Payment on Duplex' in the amount of $9,500.00 and handed the same to O. A. Zimmerman. At this time, it was understood between plaintiff and O. A. Zimmerman *that the same would constitute a down payment on a duplex on one of said lots* which Zimmerman contemplated purchasing; that the plaintiff would be allowed to select his duplex at a later date; that the said $9,500.00 check would be taken to the office of Frank C. Brosius *and when deposited would constitute a credit available to the plaintiff at the time he made his selection of the duplex.* Plaintiff, also understood that the money was to be used to purchase said lots upon one of which a duplex for the plaintiff would be built at a later date.

"6. On October 11, 1951, O. A. Zimmerman delivered plaintiff's check to the office of Frank C. Brosius. The check was received by Brosius and deposited to the credit of his (Brosius') personal account.

"7. *All parties to the transaction, Witmer, Zimmerman, and Brosius, knew* that Witmer was making this down payment in order that such money could be used by Brosius and Zimmerman to purchase the seven Eastwood Village Addition lots, on four of which duplexes would be built and from which Witmer would make his selection of a duplex at a later date *and for which Witmer would be given a $9,500.00 credit to be applied at the time Witmer made his selection of a duplex.*

"8. Thereafter, Witmer changed his mind concerning the duplexes in the Eastwood Village Addition and desired to purchase a fourplex at Hydraulic and Osie. *This information was conveyed to Zimmerman who conveyed the information to Brosius who offered no objection to the change.*

"9. The seven lots in Eastwood Village addition made, actually six building sites. Thereafter, the lots were built out. *Brosius and finally the representatives of his estate continuing on with the mortgage loan business, proceeded to sell on Zimmerman's behalf all of the six building sites and constructions located thereon. Said lots and constructions were sold to ultimate purchasers, none of which were Witmer. All of the sales proceeds from these transactions were received in the office of Frank C. Brosius.* After deducting loan costs and construction loans made to Zimmerman on these properties, Brosius and the estate of Brosius had on hand $11,895.25 more than was loaned out to Zimmerman.

"10. In November of 1952, some ten days after the death of Frank C. Brosius, plaintiff went with O. A. Zimmerman in the Brosius office to purchase the four-plex mentioned in paragraph 8. Plaintiff asked that the $9,500.00 be applied as a credit. This request was refused. Plaintiff demanded return of his $9,500.00 and this was refused also.

"11. Three months after the death of the decedent, representatives of the estate credited the total $11,895.25 excess monies received from the sales of the lots and constructions as above described to an obligation owing by Zim-

merman to the estate. Until this time the $11,895.25 was spread in the various separate accounts on the books of the decedent's company.

"12. Through the sale of the six houses and lots, the assets of the decedent and decedent's estate were augmented to the extent of $11,895.25, *$9,500.00 of which represented plaintiff's $9,500.00 previously deposited as a down payment on a duplex.*" (Emphasis added.)

The evidence disclosed that all six building sites with the improvements located thereon were sold before Brosius died; that the sales, including the receipt of money and closing transactions, were all handled by Brosius until his death, when the administrator of his estate proceeded to close the remaining transactions on these properties and collect the money. This was consistent with the manner in which Brosius and Zimmerman did business—all the "books" concerning properties upon which Zimmerman received construction loans from Brosius were kept in Brosius' office. The accounts were all open at the date of Brosius' death and no closing statement for the Eastwood Village project was given to Zimmerman by Brosius or the administrator of his estate.

Upon the record presented for review it appears that this transaction between Witmer and Brosius was one carried in Brosius' head, since it was the type of transaction not contemplated by his "bookkeeping methods." Had Brosius lived this controversy may not have arisen, but the administrator of Brosius' estate had only the books of the Brosius Investment Company upon which to rely and they reflected no credit of $9,500 for the account of Witmer. Therefore, Witmer received nothing in exchange for the $9,500 Brosius received from Witmer and such money has not been returned to Witmer.

Upon all of the facts, conditions and circumstances presented by this record, which has been reviewed and considered in detail, we are of the opinion the estate of Frank C. Brosius, deceased, was unjustly enriched by $9,500 because the books of the Brosius Investment Company failed to disclose an entry giving J. G. Witmer a credit of $9,500 as a down payment on a duplex. This was occasioned by the mistaken belief of Witmer that he had a contract with Brosius whereby he would be given a $9,500 credit on the books when he gave the check as a down payment on a duplex. By reason of these circumstances a quasi-contract or constructive trust is imposed upon the estate of Frank C. Brosius, deceased, and upon this theory J. G. Witmer was entitled to assert his remedy to enforce restitution. Under circumstances such as here presented

a representative of an estate does not acquire the assets of the estate as a *bona fide* purchaser, but stands in the same position as the decedent, had he lived.

Having fully considered the only questions raised by the appellant in its brief, and finding no error in the rulings of the trial court, the judgment is affirmed.