Henry S. PARKS, Plaintiff, Respondent
and Cross-Appellant,

v.

ZIONS FIRST NATIONAL BANK, indi-
vidually and as Executor of the Estate
of Lucile M. Parks, deceased, Inter-
mountain Health Care, Inc. dba Primary
Children's Medical Center, and Joseph J.
Taylor, Jr., Defendants, Appellants and
Cross-Respondents.

No. 18580.

Supreme Court of Utah.

Sept. 22, 1983.

John A. Snow, Michael N. Emery, Salt Lake City, for appellant.

Richard H. Thornley, Ogden, for respondent.

HALL, Chief Justice:

Defendants appeal a judgment imposing a constructive trust upon real and personal property included in the estate of Lucile M. Parks. They raise the following six points: (1) the evidence is insufficient to support the imposition of a constructive trust; (2) the findings of fact do not comply with Rule 52(a), Utah Rules of Civil Procedure; (3) the award is not supported by the evidence or the findings and conclusions of the trial court; (4) the evidence is insufficient to support the findings concerning purchase of the property; (5) plaintiff is estopped from raising his claim of ownership; and (6) plaintiff has waived his claim of ownership.

Plaintiff Henry S. Parks, who was born February 17, 1909, and Lucile M. Parks, who was born November 25, 1904, were married September 1, 1927, and were husband and wife at the time of the death of Lucile M. Parks on October 25, 1974. Their marriage was described as congenial and happy.

During the marriage, plaintiff was continuously and gainfully employed until September, 1974, at which time he retired from his position as Chief of the Chemical (Mechanical) Engineering Section and Base Consulting Engineer at Hill Air Force Base. Plaintiff testified that his retirement was necessitated by the incapacitating illness of Mrs. Parks.

Mrs. Parks, on the other hand, was not employed on a regular basis during the marriage. At the time of the marriage and for approximately four months thereafter, she worked for the telephone company. She later worked at the Plantation Inn and Ambassador Club Restaurants for approximately six months while plaintiff was in the military service. After the conclusion of her restaurant employment, in November, 1932, Mrs. Parks was never again gainfully employed outside of the home. She did, however, conduct business from time to time with her mother, Elizabeth Colemere, who was described as a business woman.

In 1943, Henry and Lucile Parks moved to a small farm located on 9400 South Street in Salt Lake City, where they commenced raising and selling turkeys. They also developed an orchard on the farm and sold the fruit. Although the income generated by this family operation was very meager, the labor required of both plaintiff and his wife to maintain it was substantial.

During the time this farm was in operation, plaintiff continued to work on a full-time basis at his outside employment. He described a typical workday as follows:

I would get up at 4:30 a.m., do a few chores, get ready to leave the house at 6:00, go to Ogden by a carpool, arrived at 7:14, worked a normal 8-hour shift, came back, make my rounds of the 21st South property, take care of the lawns, water, mow, or whatever, and arrive back at the farm, probably 7:00 at night.

Upon arriving back at the farm, plaintiff testified that he typically did the following:

Q Now, I want to go over that a little more. You get home at night and what do you do, say, from 6:00 to 10:00 in the evening?

A That was putting out feed for turkeys, repairing equipment, building equipment. See, as we were progressing in the size of our flock, the flock required more and more equipment and the responsibilities increased. As we acquired the property, our response—or my responsibility for the maintenance and so on increased.

Q When did you eat supper?

A I never ate supper before—I can't ever recall, ever in my life, eating supper before 10:00 at night.

. . . .

Q And then after your meal at 10:00, you went out with the turkeys?

A Yes.

Q For how long?

A Well, that would be from then until I arose the next morning.

Mrs. Parks' brothers, George and Burgess Colemere, testified that Mrs. Parks was the money and business manager of the Parks family. She did all the banking, kept the records, paid family expenses and signed the checks. It was also shown that Henry and Lucile Parks had a joint checking account.

During their years of marriage, the Parks acquired various pieces of real property, all of which are located in Salt Lake County. At the time of her death, the title to each of these properties was vested in Mrs. Parks alone. The evidence concerning the acquisition of each parcel is different, and each parcel will hereafter be discussed separately.

1. 21st South Property

The 21st South property consisted of ten different lots situated at 1427 and 1431 East 2100 South. These lots were obtained by four separate conveyances.

The first conveyance consisted of four lots, which were described as Lots 38 to 41. The only evidence concerning the acquisition of title to these lots is a deed from Salt Lake County dated March 4, 1940, which quitclaims these lots to Lucile M. Parks. Although the deed itself recites a consideration of $352.72 for the purchase of the lots,

a tax sale redemption certificate attached to the deed in the record indicates that only $156.72 was actually paid, and that such payment was made by Mrs. Parks. It is noted that Mrs. Parks was not employed at the time she made this payment.

Mr. Parks testified that he later constructed a fourplex on Lots 38 to 41, which generated rental income over the years.

The second conveyance occurred on December 3, 1945. A warranty deed conveying Lots 42 and 43 was executed by O.P. Hendricksen and Kemilla Hendricksen, as grantors, in favor of Henry S. Parks and Lucile M. Parks, as grantees. Mr. Parks testified that he personally paid approximately $700 cash for this purchase.

A second warranty deed conveying Lots 42 and 43 was executed in 1963 by Henry S. Parks, as grantor, in favor of Lucile Parks, as grantee. There is no evidence in the record as to why Mr. Parks made this conveyance.

Lots 46 and 47 were purchased on December 28, 1945, by tax deed from Salt Lake County for the sum of $300, naming Mrs. Parks as the sole grantee. Again it is noted that Mrs. Parks was not gainfully employed in 1945, or anytime after 1932, while Mr. Parks was employed full-time.

The only evidence concerning the acquisition of the final two lots, Lots 48 and 49, is a warranty deed dated March 9, 1946, executed by "E. Rogers," as grantor, in favor of Lucile Parks. E. Rogers, also known as Elizabeth Rogers, Elizabeth Colemere Rogers and Elizabeth Colemere, was Mrs. Parks' mother.

2. 33rd South Property

With respect to the 33rd South property, the only evidence concerning the title to the property is a warranty deed dated June 23, 1959, and executed by W.H. Florence in favor of Mrs. Parks, as grantee. It was also shown, however, that mortgages had been placed upon this property in the names of both plaintiff (Mr. Parks) and Mrs. Parks, and that the mortgage money had been used to construct two fourplexes on the same property.

3. 9800 South Property

A warranty deed was executed on this property by Elizabeth Colemere, as grantor, in favor of Lucile Parks in 1962. Mr. Parks testified that he was unaware that this conveyance had occurred until Mrs. Parks' will was read, and then, he was under the impression that the property had been inherited by his wife. He further testified, however, that he later found out that this property had been purchased, and that the family's only sources of income at that time were his salary and the rents from the investment properties.

With respect to the purchase of this property, Burgess Colemere (Mrs. Parks' brother) testified that his mother, Elizabeth Colemere, had owned a 100-acre parcel of land, which included the 9800 South property, and that she conveyed 25 acres to each of her four children. The 9800 South property constituted Lucile's 25-acre portion. He further testified that each of the children was to pay approximately $100 to $200 per month for his or her 25-acre parcel, but that Lucile had not made her payments.

4. Lincoln Street Property

Record title to the Lincoln Street property was evidenced by an executor's deed dated November 27, 1968, executed by George and Burgess Colemere, co-executors of the estate of Elizabeth Colemere Rogers, in favor of Lucile Parks.

Although the executor's deed recites payment of $17,700 for this property, Burgess Colemere testified that nothing was actually paid by Lucile Parks. According to Mr. Colemere, Mrs. Parks was awarded a credit by her mother's estate in the amount of $7,142.62 for improvements that she *and her husband* (plaintiff) had made on the property while living thereon. As to the remaining amount of the purchase price, Mrs. Colemere testified that such amount was deducted from Lucile's share of her mother's estate.

5. 9400 South Property

The 9400 South property consists of two parcels, which are identified as parcels H and I. Parcel H, consisting of 4.83 net

acres, was inherited by Mrs. Parks from her mother, while parcel I, which consists of approximately 20 acres, was purchased from Mrs. Parks' mother. Parcel I was known as the family farm and was the Parks' residence from 1943 until the death of Mrs. Parks in 1974.

The purchase of parcel I was evidenced by a uniform real estate contract dated June 5, 1943, executed by E. Colemere, as seller, and Henry Parks and Lucile Parks, as buyers. The contract indicated a purchase price of $3,000. The property (parcel I) was later (1951) conveyed by warranty deed from E. Colemere to Lucile Parks as sole grantee.

Within a week after Lucile Parks' funeral services, plaintiff contacted attorney Grant Macfarlane, Sr., and inquired whether Mrs. Parks had executed a will. Mr. Macfarlane told plaintiff that he had drawn a will for Mrs. Parks some two or three years prior, and that the will was being kept at Zions First National Bank. Thereafter, plaintiff went to Zions Bank, where he met with Mr. Macfarlane, and Jay Jeppson and Troy Thornton of the Zions Bank Trust Department, and read the will.

The will of Lucile Parks, dated November 17, 1971, provides that all real property in her estate, except parcel I of the 9400 South property, should be sold and the proceeds from such sale held in trust by Zions Bank. As trustee, Zions Bank was directed to hold, manage and distribute such funds in accordance with the provisions of the will. The will also provided that plaintiff was to retain a life estate in the farmhouse used by himself and Mrs. Parks as their residence, and, at the discretion of Zions Bank, Mr. Parks was to be provided with support in an amount not exceeding $200 a month and financial assistance in the event of illness or emergency. However, all of the benefits provided to plaintiff under the will would terminate if he remarried, and, as to the life estate, such would also terminate if he failed to occupy the farmhouse for one year. Upon the death or remarriage of plaintiff, the will dictated that a sum not exceeding $10,000 was to be paid to Joseph J. Taylor, and the remainder paid to Primary Children's Medical Center.

With respect to the personal property, the will declares that the household furniture and miscellaneous personal property belong to plaintiff, having been purchased by him with his own separate funds. However, approximately one month after the execution of the will, Mrs. Parks executed a codicil thereto declaring that all household furniture and miscellaneous personal property, including carpets, books, pictures and musical instruments were hers, and that plaintiff had the right to use such property during his lifetime.

At the time of the review of the will, plaintiff was grieving for his wife and apparently continued to do so for approximately two years. His sister-in-law, LaRue Colemere, testified that he was in a state of shock and "seemed like a man that was dazed ...." His brother-in-law, George Colemere, testified that plaintiff "[c]ame close to a breakdown ...."

Plaintiff's recollection of his condition is as follows: "I think I reacted much in the manner of a zombie. I didn't know what was going on or how to raise any verbal statements." Plaintiff testified, "I had very little realization of any of the consequences."

As noted previously, Grant Macfarlane, Sr., was the first attorney contacted by plaintiff after the death of his wife. Mr. Macfarlane arranged for the reading of the will at Zions Bank, but did not offer any legal advice with respect thereto. In fact, he later appeared as the attorney for the executor (Zions Bank) of the estate.

LaRue Colemere, plaintiff's sister-in-law, testified that she and her husband, George Colemere, suggested that plaintiff see an attorney and finally took him to attorney Sam Bernstein. Plaintiff testified that Mr. Bernstein read the will and told him that he could get half of the estate without even going to court, but that he would have to act quickly. Plaintiff did not, however, return to Mr. Bernstein.

In January of 1976, plaintiff retained Leo Jardine to handle his claim against his deceased wife's estate. Mr. Jardine advised him that he would take care of the matter. He later prepared and had plaintiff sign an objection to petition for amendment of the last will and testament, but failed to file the document or do anything further in the case.

In November, 1977, plaintiff went to a third attorney, David Stott, about the estate. Plaintiff was concerned at that time with a petition he had received to close the estate. Mr. Stott wrote a letter to Zions Bank discussing plaintiff's rights under the will, and gave the bank ten days to respond. Because Mr. Stott gave the bank an extension on the ten-day period to respond to the letter, plaintiff terminated Mr. Stott and engaged the attorneys presently appearing in this matter on his behalf.

In December, 1975, it was discovered that Mrs. Parks' will did not conform to the Tax Reform Act of 1969, and that as a consequence, the estate was going to incur a substantial tax liability. In an effort to reduce such liability, Mr. Macfarlane, acting on behalf of the executor, Zions Bank, convinced plaintiff to agree to an amendment of the trust to increase plaintiff's monthly allowance from $200 to $500, and to relinquish the health and accident support provision.

As noted above, the will provided plaintiff a life estate in the farmhouse, so long as he did not move out for longer than one year, and did not remarry. In April, 1975, plaintiff decided to move from the farm to a house on Lakeline Drive in Salt Lake City. Plaintiff went to Mr. Thornton of Zions Bank and requested the move. The court was petitioned and an order was entered approving the move. The petition indicated that the Lakeline Drive residence could be purchased for $95,000 and the farmhouse and farm could be sold for approximately $600,000, making an annual re-

turn to the estate of $40,000 per year which it would not otherwise have realized.

Plaintiff remained at the Lakeline Drive residence until March, 1977. He thereafter moved to a condominium at Canyon Road Towers, Unit 415. The petition for such move was again prepared by representatives of Zions Bank and Primary Children's Medical Center. It was indicated in the petition that the residence on Lakeline Drive could be sold for approximately $100,000 and the condominium unit could be purchased for $72,250, and that the difference could be invested, resulting in an $8,000 per year return to the estate which would not otherwise be realized.[1]

On December 3, 1977, plaintiff remarried. Shortly thereafter, upon discovering his remarriage, Zions Bank discontinued the $500 per month support check, pursuant to the clause of the will conditioning such support upon plaintiff's remaining unmarried. This monthly allowance was, however, reinstated by stipulation during the trial.

The beginning inventory in the Lucile Parks estate listed the gross estate at $839,159.43. At the time the petition for final settlement and distribution was filed, the estate had earned $344,394.54, making a gross estate of $1,183,553.97 before estate expenses and deductions. At the time of trial, all real estate inventoried in the estate had been sold by the executor and the estate assets at that time were $920,500.

Plaintiff initiated this action in response to the petition to close the estate filed by Zions Bank, the executor, on November 22, 1977. Plaintiff filed an objection in the probate proceeding and filed the complaint in this proceeding seeking to impose an oral, resulting or constructive trust in his favor on certain household furnishings and on the real property set forth above.

The lower court found that the real property was subject to a constructive trust, and awarded judgment in favor of plaintiff for the sum of $175,000. Additionally, the

1. Plaintiff later moved from Unit 415 to Unit 709 of the same condominium complex, Canyon Road Towers.

court awarded plaintiff fee title to the condominium in which he was then residing.

Appellants herein seek a reversal of the trial court's judgment, or in the alternative, a new trial. Plaintiff cross-appeals, seeking an increase in the damage award and a finding of an oral trust.

## I.

The first point defendants raise on appeal is that there is no evidence in the record to justify the trial court's imposition of a constructive trust upon the estate of Lucile Parks. They argue that the circumstances or elements which must be present in order to justify imposing such a trust are a "confidential relationship" between a transferor and transferee of property and a breach by the transferee of an "oral or implicit agreement" to hold the property in trust for the transferor.

The purported authority for defendants' argument regarding constructive trusts is the case of *Nielson v. Rasmussen.*[2] In *Nielson,* this Court affirmed the trial court's decision not to impose a trust and made the following statement with regard to the circumstances under which a constructive trust could be imposed:

> The "certain circumstances" which the trial court ... would have had to find were that the defendants at the time of the transfer of property to them by plaintiffs ... *orally agreed* to hold said lots for Rasmussens [beneficiaries] and *were in a confidential relationship* to the plaintiffs.[3] [Emphasis added.]

The Court further noted in *Nielson* that these "certain circumstances" must be shown to exist by "clear and convincing evidence."[4]

As additional support for this argument, defendants cite § 44 of the Restatement (Second) of Trusts, which states:

(1) Where the owner of an interest in land transfers it inter vivos to another in trust for the transferor, but no memorandum properly evidencing the intention to create a trust is signed, as required by the Statute of Frauds, and the transferee refuses to perform the trust, the transferee holds the interest upon a constructive trust for the transferor, if

....

(b) the transferee at the time of the transfer was in a confidential relation to the transferor....

....

Defendants further contend that under certain conditions the requisite promise or agreement between the transferor and transferee need not be expressly stated at the time of the conveyance. They cite *Haws v. Jensen,*[5] wherein this Court affirmed the imposition of a constructive trust despite the lack of an express promise, and explained its decision by quoting the following passage from a New York Court of Appeals decision: "Though a promise in words was lacking, the whole transaction, it might be found, was 'instinct with an obligation' imperfectly expressed."[6] Based upon these authorities, defendants draw the conclusion that, universally, courts require an oral, or at least implicit, agreement and a breach thereof before they will impose a constructive trust.

Defendants point out that not one single witness testified to any conversation wherein Mrs. Parks promised or agreed to hold any of the subject parcels of property in trust for plaintiff. Furthermore, defendants argue that not one witness testified to any conversations wherein plaintiff and his wife made any statement which would indicate that either of them recognized that Mrs. Parks took said property subject to an obligation to hold it in trust for plaintiff.

Defendants argue that not only does the evidence fail to demonstrate a promise or

---

**2.** Utah, 558 P.2d 511 (1976).

**3.** *Id.* at 513.

**4.** *Id. See also Matter of Estate of Hock,* Utah, 655 P.2d 1111 (1982).

**5.** 116 Utah 212, 209 P.2d 229 (1949).

**6.** *Id.* 209 P.2d at 232, quoting *Sinclair v. Purdy,* 235 N.Y. 245, 139 N.E. 255, 258 (1923).

obligation between plaintiff and his wife, it suggests the opposite conclusion. During the three-year period between the death of Mrs. Parks and the filing of this suit, plaintiff participated and acquiesced in the administration of the estate in accordance with the provisions of the will. He did not, during that period, make any claim of ownership as to the real property included in the estate.

We are unable to countenance defendants' narrow construction of the law pertaining to constructive trusts. Contrary to the implications of their position, neither § 44 of the Restatement of Trusts nor this Court's statement (above) in the *Nielson* decision constitutes an exclusive definition of constructive trusts and exhausts the possible circumstances under which a trust such as this may be imposed. Rather, these authorities merely describe the circumstances and requirements necessary to impose just one of the numerous types of constructive trusts.

> It has been said of constructive trusts: [A]n attempt to define or describe a constructive trust would be inadequate because such definition or description would be too narrow in its scope and fail to include important types of constructive trusts.[7]

And further, "[t]he forms and varieties of these trusts . . . are practically without limit." [8]

The intended scope of § 44 (Restatement (Second) of Trusts) is clearly identified by the following passage from the Restatement of Restitution:

> Constructive trusts are not dealt with in the Restatement of Trusts, except insofar as they *arise out of express trusts or attempts to create express trusts.* [Emphasis added.] [9]

According to this statement, unless an "express trust" has been established, or at least asserted, as the basis of entitlement to property, this section does not apply. In other words, § 44 applies to only one type of constructive trust, that which "arise[s] out of express trusts or attempts to create express trusts."

That the scope of § 44 is thus limited is further revealed by the language of the section itself. Such language describes the applicable situation as one in which an express trust has been rendered unenforceable for failure to comply with the requirements of the Statute of Frauds. In this situation, § 44 provides that the intended trust may be imposed, notwithstanding the Statute of Frauds violation, under the guise of a constructive trust,[10] upon the condition that "the transferee at the time of the transfer was in a confidential relation to the transferor." *Supra.*

The scope of this Court's statement in the *Nielson* decision (quoted above) is likewise limited to that particular type of constructive trust which arises from an express trust. In *Nielson,* the original dispute arose between plaintiffs and the Rasmussens. Defendants, the Carters, were subsequently joined as third parties. Plaintiffs and the Rasmussens eventually settled. By the terms of the settlement agreement, plaintiffs were to transfer to the Rasmussens four building lots. However, these same four building lots, along with other real property, had previously been sold to the Carters. Plaintiffs contended that they had not actually sold these lots to the Carters, but that they had transferred them to the Carters subject to an *oral agreement* that said lots would be held in trust (express trust) for the benefit of plaintiffs and the Rasmussens. This is precisely the situation to which § 44, as well as § 45, of the Restatement of Trusts applies.

Inasmuch as the basis of plaintiff's claim of entitlement to the four lots was an unen-

---

**7.** *Witmer v. Brosius' Estate,* 184 Kan. 273, 336 P.2d 455, 460 (1959).

**8.** *Fitz-Gerald v. Hull,* 150 Tex. 39, 237 S.W.2d 256, 263 (1951).

**9.** Restatement of Restitution § 160 comment a (1937).

**10.** Restatement (Second) of Trusts § 44 comment a (1959).

forceable trust,[11] this Court held, citing § 45 of the Restatement (Second) of Trusts ("Effect of Failure of Oral Trust for a Third Person"),[12] that the intended express trust could be imposed as a constructive trust upon proof of an oral agreement and a confidential relationship.

The type of constructive trust described above is a species of the express trust out of which it arises. It therefore inherits certain fundamental characteristics of the express trust, one of which is "intention." An express trust is generally described as "a fiduciary relationship with respect to property, arising as a result of a *manifestation of an intention to create it* and subjecting the person in whom the title is vested to equitable duties to deal with it for the benefit of others."[13] (Emphasis added.)

Aside from the type of constructive trust described above, constructive trusts generally are not based upon the "intention" of the parties.[14] Indeed, the most notable distinction between constructive trusts and other types of trusts, such as express and resulting trusts, is generally the "intention" element.

It is axiomatic that an essential element of any agreement is the "intention" to create it. Accordingly, those constructive trusts which may arise without proof of the parties' "intention" to create a trust cannot and do not require, as defendants propose, that some form of agreement be manifested.

In the present case, plaintiff's claim against his deceased wife's estate was based upon theories of oral, resulting and constructive trusts. In other words, he was not relying solely upon the oral express trust theory, as did the plaintiffs in the *Nielson* case, and as occurs in most cases wherein §§ 44 and 45 of the Restatement (Second) of Trusts are applied. The trial court rejected his claims based on theories of oral and resulting trusts, but found sufficient evidence to support his claim based on the theory of constructive trusts.

In rejecting plaintiff's claim that a resulting trust should be applied, the trial court commented: "[A] resulting trust does not result merely because the husband puts up the money to purchase property in his wife's name." This statement was apparently based upon the rule of law articulated in § 442 of the Restatement (Second) of Trusts, which reads thus:

> Where a transfer of property is made to one person and the purchase price is paid by another and the transferee is a wife, child or other natural object of bounty of the person by whom the purchase price is paid, a resulting trust does not arise unless the latter *manifests an intention that the transferee should not have the beneficial interest in the property.* [Emphasis added.]

This rule, like the rule referred to above governing the imposition of an oral express trust, requires a "manifestation of intent," i.e., intent to retain the beneficial interest in the property. The trial court apparently concluded that the element of intent necessary to give rise to a resulting trust was absent.

While we acknowledge that the resulting trust theory set forth in § 442, *supra,* is commonly applied under circumstances as herein presented (i.e., where a husband pays the purchase price for real property and places the title thereto in either his wife's

---

11. The express trust was unenforceable because there was no written memorandum evidencing the intention to create it, as required by the Statute of Frauds.

12. Section 45 was applied in *Nielson,* rather than Section 44 because Section 45 deals with third-party beneficiaries, and the party holding the equitable interest in *Nielson* (the Rasmussens) was a third party. Section 44, although very similar to Section 45 in substance, applies where the settlor of the alleged trust is also the beneficiary thereof. In light of the similarities between the two sections, the previous discussion regarding Section 44 is wholly pertinent to Section 45.

13. 5 A. Scott, The Law of Trusts § 462.1 (1967). *See also supra* n. 9.

14. *Id. See also Matter of Estate of Hock, supra* n. 4, at 1114.

name solely,[15] or in both his and his wife's name jointly[16]), we are not aware of any rule of law that would inhibit or discourage the application of the constructive trust theory advanced in § 160 of the Restatement of Restitution under such circumstances.

Section 160 presents the broadest possible application of a constructive trust. It provides that a constructive trust may arise "where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it ...."[17] Such breadth has also been described as follows:

> Constructive trusts include all those instances in which a trust is raised by the doctrines of equity for the purpose of working out justice in the most efficient manner, where there is no intention of the parties to create such a relation, and in most cases contrary to the intention of the one holding the legal title, and where there is no express or implied, written or verbal, declaration of the trust.[18]

The recent pronouncements of Pennsylvania courts are particularly apt on the question of whether § 160 may be applicable under circumstances outlined in § 442. In *Kohr v. Kohr,*[19] under circumstances somewhat similar to those before us now, the Superior Court of Pennsylvania, applying § 442, held that a resulting trust could not be imposed because no "intent to retain a beneficial interest" had been shown. The court then resorted to the § 160 constructive trust theory. However, a constructive trust was not imposed in that case for the reason that the plaintiff failed to prove "unjust enrichment" to the transferee of the disputed property. Similarly, in the case of *Yohe v. Yohe*[20] where the plaintiff/husband had conveyed his one-half interest in the family residence (which had been purchased by both spouses) to his wife, the Pennsylvania Supreme Court considered both the § 160 and § 442 trust theories and determined that a § 160 constructive trust was the most appropriate remedy. In both these cases, the Pennsylvania courts considered and applied the provisions of § 160 under circumstances described in § 442.

Yet another jurisdiction to apply § 160 under the specific circumstances posed in § 442 is Delaware. In a very recent decision, *Adams v. Jankouskas,*[21] the Delaware Supreme Court held that it was appropriate, not only to apply both theories under such circumstances, but to actually impose both types of trusts, provided, of course, the elements of such trusts were proven. The factual situation in the *Adams* case is remarkably similar to the present case. There, as here, the toils and labors of a husband and wife over the course of their marriage resulted in the accumulation of a substantial estate. The wife, who was considered the dominant spouse, managed the financial affairs. As a result of her management, most of the accumulated properties and assets were held in her name. Upon her death, it was discovered, much to her husband's surprise, that she had devised the majority of the estate to a niece and left little to her husband. Some two years after her death, the husband brought suit to have a constructive or resulting trust imposed upon his share of the estate. The lower court granted his request, imposing a resulting and constructive trust upon what it determined to be the husband's share of the estate, and on the subsequent appeal brought by the deceased wife's estate, the

---

**15.** See *Anderson v. Cercone,* 54 Utah 345, 180 P. 586 (1919); *Scanlon v. Scanlon,* 6 Ill.2d 224, 127 N.E.2d 435 (1955).

**16.** See 89 C.J.S. Trusts § 127 (1955); *Gorden v. Gorden,* 93 Nev. 494, 569 P.2d 397 (1977).

**17.** Restatement of Restitution § 160 (1937). See also *Matter of Estate of Hock, supra* n. 4; *Fitz-Gerald v. Hull, supra* n. 8; *G & M Motor Co. v. Thompson,* Okl., 567 P.2d 80 (1977);

*Huber v. Coast Investment Co.,* 30 Wash.App. 804, 638 P.2d 609 (1981).

**18.** J. Pomeroy, Equity Jurisprudence § 1044 (1941).

**19.** 271 Pa.Super. 321, 413 A.2d 687 (1979).

**20.** 466 Pa. 405, 353 A.2d 417 (1976).

**21.** Del.Supr., 452 A.2d 148 (1982).

Delaware Supreme Court affirmed with the following observation:

> It is important to note that this is not a case where a party was disappointed with what he received under a will. Rather, it is one in which joint funds were committed in obvious trust to one partner and then pooled to purchase property and make investments for the mutual benefit of both. Under these circumstances Chancery may impose this trust upon the accumulated assets in whatever form they now take.[22]

In light of the foregoing authority, as well as the inherent broad scope of the § 160 constructive trust, we conclude that the facts and circumstances of the instant case warrant application of the provision of § 160. The question remaining is whether the record contains clear and convincing evidence to satisfy even the broad requirements of § 160 for the imposition of a constructive trust.

The evidence clearly shows that the title to each of the subject parcels of property was in the name of Mrs. Parks alone. The question as to whether Mrs. Parks (her estate) would be "unjustly enriched" by retaining sole ownership of these properties depends upon whether plaintiff actually had an "equitable interest" in such properties.

With respect to the question of plaintiff's "equitable interest" in the properties, the trial court found that during the marriage of Mr. and Mrs. Parks, Mr. Parks (plaintiff) "was continuously employed and a substantial part of the marital estate was acquired from his earnings." Defendants contend, however, that this finding is not supported by the evidence. They contend that the evidence shows that plaintiff had no part in the acquisition or ownership of the subject property and that Mrs. Parks alone acquired and owned it all. They conclude that inasmuch as the property was exclusively owned by Mrs. Parks, plaintiff had no "equitable interest" therein, and therefore

its inclusion in her estate did not constitute an "unjust enrichment."

Our survey of the record reveals that it contains much conflicting evidence regarding the acquisition and ownership of the property included in Mrs. Parks' estate. Our review of conflicting evidence in equity cases is governed by the following well-settled rule:

> The findings of the trial courts on conflicting evidence will not be set aside unless it manifestly appears that the court has misapplied proven facts or made findings clearly against the weight of the evidence.[23]

The evidence clearly shows that plaintiff was gainfully employed throughout the entire course of the marriage, and that Mrs. Parks was only employed for a brief period (approximately ten months). It shows that at the time each of the subject properties was acquired, plaintiff was employed and had a substantial income, while Mrs. Parks had no outside employment or separate income. It further shows that plaintiff's income and individual labor were responsible for improvements made on many of the properties, as well as the maintenance of the properties.

This evidence clearly and adequately supports the trial court's finding that plaintiff's labors and earnings were responsible for the acquisition of a substantial portion of the marital estate. It is therefore appropriate to conclude that plaintiff had an "equitable interest" in the subject property, and that the total inclusion of such property in the estate of Mrs. Parks constituted an "unjust enrichment" of her estate. Accordingly, we hold that the trial court's imposition of a constructive trust upon the estate of Mrs. Parks was justified, at least as to that portion representing plaintiff's proven interest therein.

## II.

Defendants next contend that the trial court's findings of fact do not comply with

**22.** *Id.* at 153.

**23.** 209 P.2d at 233, quoting *Olivero v. Eleganti,* 61 Utah 475, 214 P. 313, 315 (1923). *See also* 655 P.2d at 1114.

Rule 52(a) of the Utah Rules of Civil Procedure, and therefore the judgment entered pursuant to such findings must be vacated.

■ Rule 52(a) requires that a trial court find facts specially in all actions tried upon the facts without a jury. Such findings of fact must clearly indicate the "mind of the court," [24] and must resolve all issues of material fact necessary to justify the conclusions of law and judgment entered thereon.[25] Furthermore, failure of a trial court to enter adequate findings requires the judgment to be vacated.[26]

Defendants allege that the trial court's findings of fact do not address any of the issues germane to the causes of action and defenses raised in the pleadings. Specifically, they allege that no findings were made with respect to the elements of a constructive trust, and further, that none were entered regarding defendants' affirmative defenses of estoppel and waiver. (Additional deficiencies in the trial court's findings of fact and conclusions of law are alleged under subsequent points of the appeal.)

In addition to the rules set forth above regarding the sufficiency of the trial court's findings of fact, this Court has observed:

> The importance of complete, accurate and consistent findings of fact in a case tried by a judge is essential to the resolution of dispute under the proper rule of law. To that end the findings should be sufficiently detailed and include enough subsidiary facts to disclose the steps by which the ultimate conclusion on each factual issue was reached.[27] [Citations omitted.]

■ Upon reviewing the pleadings, the evidence and the findings of fact in this matter, we conclude that, although the findings with respect to the issues delineated under this particular point are not as full and complete as might be desired, they do ascertain the ultimate facts and sufficiently conform to the pleadings and the evidence supporting the judgment.

As noted above in our discussion of constructive trusts, the trial court's findings that the title to the property had been held solely by Mrs. Parks, that plaintiff had worked continuously during the marriage and that a substantial part of the marital estate had been acquired with his efforts and earnings adequately established the elements necessary to justify the imposition of a constructive trust.

■ It is true that the findings do not specifically negative defendants' allegations of estoppel and waiver. Substantial compliance with Rule 52(a) does not, however, require that the trial court negative every allegation contained in the pleadings; rather, the Rule is satisfied if, from the findings it (the trial court) makes, there can be no reasonable inference other than that it must have found against such allegations.[28] In our view, the findings herein clearly infer the trial court's denial of these allegations.

### III.

Next, defendants argue that, even assuming a constructive trust was properly imposed, the award proceeding from the judgment was not supported by the evidence or the findings and conclusions.

Defendants allege that they occupy the status of a "gratuitous transferee"[29] with

**24.** *State ex rel. K.D.S.*, Utah, 578 P.2d 9, 11 (1978).

**25.** *Romrell v. Zions First National Bank*, Utah, 611 P.2d 392, 394–95 (1980); *Boyer Company v. Lignell*, Utah, 567 P.2d 1112, 1113 (1977).

**26.** *Kinkella v. Baugh*, Utah, 660 P.2d 233, 236 (1983); *Anderson v. Utah County Board of Com'rs*, Utah, 589 P.2d 1214, 1216 (1979).

**27.** *Rucker v. Dalton*, Utah, 598 P.2d 1336, 1338 (1979).

**28.** *Patton v. Kirkman*, 109 Utah 487, 167 P.2d 282, 283 (1946).

**29.** A "gratuitous transferee" is defined in the Restatement of Restitution § 204 (1937) as one who "receives the title to property of which another has the beneficial interest without notice of the other's interest but without paying value . . . ."

respect to the property subject to the constructive trust. They allege further that, inasmuch as they have already sold the real property originally included in the estate, the measure of recovery against them, pursuant to the constructive trust, is determined as follows:

> Where a person receives the title to property of which another has the beneficial interest without notice of the other's interest but without paying value, and being still without such notice exchanges it for other property, he is under a duty either
>
> > (a) to surrender the property which he acquired in exchange, or, at his option,
> >
> > (b) to pay the value of the property which he originally received, the property which he acquired in exchange being subject to an equitable lien for such payment.[30]

And further,

> [The transferee] is ... liable to the claimant to the extent, but only to the extent, to which he is unjustly enriched at the expense of the claimant. If the ... [transferee] makes a profit, he can keep the profit; if he incurs a loss, he need not make it good.[31]

Based upon these authorities, defendants suggest that their liability is limited to the value of the property subject to the trust, and further, that there must be a link between said value and the amount awarded to plaintiff.

Defendants argue that the requisite "link" is missing in the present case. They point out that the property subjected to the constructive trust consisted of the entire estate, while the amount awarded plaintiff was a sum of $175,000 and a condominium. They argue that there are no findings or conclusions which even remotely explain, justify or link this award to the value of the estate. Accordingly, they contend that the judgment should be vacated.

The propriety of the damages award in this case is also challenged by plaintiff. He contends that, given the size of the estate ($920,500), his award should be substantially increased to more closely reflect his contribution to the marital estate.

Plaintiff's position is that Mrs. Parks herself, not the defendants, is the party whose status, with respect to the property subject to the constructive trust, is relevant to the determination of liability. He contends that Mrs. Parks, as the original trustee under the constructive trust, wrongfully disposed of the trust property through her undisclosed (secret) will and thereby incurred liability as a "conscious wrongdoer." Plaintiff points out that the major distinction between this classification and the classification to which defendants allegedly belong ("gratuitous transferee") is that a "conscious wrongdoer" is liable, not only for the value of the property wrongfully transferred, but also for the value of whatever *profits* are realized as a result of such transfer.

■ We are in agreement with plaintiff's position insofar as it classifies Mrs. Parks as a "conscious wrongdoer" and holds her estate accountable and liable to plaintiff for his share of any profits realized on the res of the constructive trust. Under the constructive trust theory, Mrs. Parks, as transferee of the property, assumed the role of a "constructive trustee."[32] Although her role as a "constructive trustee" did not entail the numerous fiduciary obligations which are imposed upon a trustee of an express trust, it did require that she respect and account for the equitable interest held by plaintiff in his beneficiary capacity.[33] Mrs. Parks' testamentary disposition of the trust property, with knowledge of her husband's interest therein, constituted a breach of her responsibility as constructive trustee, earning her the status of a "conscious wrongdoer."

---

**30.** Restatement of Restitution § 204 (1937).

**31.** Restatement of Restitution § 204 comment a (1937).

**32.** 5 A. Scott, The Law of Trusts § 462 (1967).

**33.** *Id.*

A "conscious wrongdoer" is one who "wrongfully disposes of property of another knowing that the disposition is wrongful and acquires in exchange other property." [34] Under the circumstances as here presented, Mrs. Parks herself did not receive property in exchange for the original property in the constructive trust; however, her estate, and more specifically her personal representative (Zions Bank/executor), who stands in the same position of the decedent had she lived,[35] did receive exchange property, as well as a substantial profit therewith.

The liability of a "conscious wrongdoer" may extend beyond the mere restoration of the status quo. We acknowledge with approval the following principle of law and consider it dispositive herein:

> Where a person by the consciously wrongful disposition of the property of another acquires other property, the person whose property is so used is not only entitled to hold the wrongdoer personally liable for the value of the property wrongfully disposed of but he is entitled as an alternative to the property so acquired. If the property so acquired is or becomes more valuable than the property used in acquiring it, the profit thus made by the wrongdoer cannot be retained by him; the person whose property was used in making the profit is entitled to it.[36]

The reasoning behind this rule has been stated thus:

> If, however, the wrongdoer were permitted to keep the profit, there would be an incentive to wrongdoing, which is removed if he is compelled to surrender the profit. The rule which compels the wrongdoer to bear any losses and to surrender any profits operates as a deterrent

upon the wrongful disposition of the property of others.[37]

The record shows that the value of the estate of Lucile Parks has increased substantially since her death. The petition for final settlement and distribution listed gross income at $344,394.54, for a total gross estate of $1,183,553.97. At the time of the trial (July 6, 1982), it was stipulated that the net value of the estate was $920,-500.

In accordance with the foregoing reasoning, we hold that plaintiff is entitled to receive his share of the income and profits realized upon the trust res as a result of its wrongful disposition.

■ We also consider meritorious defendants' argument that the requisite link between the value of the property subject to the constructive trust and the award is missing. Although the net value of the estate was stipulated at $920,500, there was no indication in the findings as to what portion of the net estate represented plaintiff's share (taking into account income and profits as indicated above), and thus, there was no support for the amount of the award as set forth in the conclusions.

In light of the insufficiency of the findings with respect to the award, we must vacate the judgment and remand the case for the purpose of making adequate findings as to the value of plaintiff's equitable interest in the estate.[38]

### IV.

Defendants' fourth point on appeal is that the findings concerning the purchase of the property are not supported by the

---

**34.** Restatement of Restitution § 202 (1937).

**35.** *Supra* n. 7, 336 P.2d at 463.

**36.** Restatement of Restitution § 202 comment c (1937).

**37.** *Id.*

**38.** It is noted that plaintiff did not have any interest in the property denominated as parcel H of the 9400 South property due to the fact that it was inherited by plaintiff's wife from her mother's estate. Nor did plaintiff's interest in

the Lincoln Street property exceed his share of the credit extended by his wife's mother's estate on the purchase price of the property for work and improvements made on said property by plaintiff and his wife. And further, inasmuch as no payment or improvements were ever made by plaintiff on the 9800 South property or lots 48 and 49 of the 21st South property, which properties were conveyed to plaintiff's wife by her mother, plaintiff should have no interest therein.

evidence. The particular findings referred to by defendants are as follows:

6. During the course of said marriage, plaintiff and decedent purchased real and personal property.

8. During said marriage, plaintiff was continuously employed and a substantial part of the marital estate was acquired from his earnings.

Under Point I of this opinion, we discussed the sufficiency of the evidence and the findings with regard to plaintiff's participation in the acquisition of the property included in Mrs. Parks' estate. We determined that the evidence and the findings on this particular point adequately supported the judgment. We now, therefore, defer to that previous determination.

### V. and VI.

Under defendants' final two points of contention, they allege that plaintiff is precluded on theories of estoppel and waiver from asserting ownership of the subject property.

In order to prevail in their estoppel claims, defendants must satisfy the test of equitable estoppel set forth in *Koch, Inc. v. J.C. Penney Co.,* which is:

[W]hether there is conduct, by act or omission, by which one party knowingly leads another party, reasonably acting thereon, to take some course of action, which will result in his detriment or damage if the first party is permitted to repudiate or deny his conduct or representation.[39]

■ We have reviewed the evidence alleged by defendants as supportive of this claim and find that it is insufficient to satisfy the test articulated in the *Koch* decision, *supra.* Even if we were to concede to their averment that plaintiff's conduct, i.e., acquiescence in the administration of the estate and failure to assert his claim of ownership for three years following the death of his wife, led them to sell the estate's assets and invest the proceeds, we could not also concede that the course of action (sale of assets and investment of proceeds) taken by defendants was detrimental to them or to the estate.

The evidence shows that when plaintiff moved from the farmhouse and farm, the estate received an additional $40,000 per year because of the ability to sell the farm and the farmhouse and invest the proceeds. The estate also received the benefit from plaintiff's move from Lakeline Drive to the condominium since the residence on Lakeline Drive was sold for more money than was paid for the condominium, and the estate received an additional benefit of approximately $8,000 annually. Clearly, there was no detriment realized from these or any of the transactions which occurred during the three-year administration of the estate.[40]

Defendants claim that the test for establishing a waiver of rights is less demanding than the test for equitable estoppel. They rely upon the following statement made by this Court in *Sullivan v. Beneficial Life Insurance Co.:*[41]

[A] waiver operates as an estoppel upon the party who waives; but it is not essential to a waiver that a party in whose favor it is made must prove all the elements of an estoppel in pais before he is entitled to avail himself of the waiver.

In *American Savings & Loan Association v. Blomquist,*[42] this Court held that waiver is the intentional relinquishment of a known right and there must be an existing right, benefit or advantage, knowledge of its existence, and an intention to relinquish

---

**39.** Utah, 534 P.2d 903, 905 (1975). *See also Carnesecca v. Carnesecca,* Utah, 572 P.2d 708 (1977).

**40.** At the conclusion of the trial, the judge made the following observation with regard to the claim of equitable estoppel:

Again, I might say this. I don't think there's an estoppel. The bank—there is no detriment to the hospital by anything that he did. I can't see any detriment at all. And they still got the money. It's presumably still drawing interest.

**41.** 91 Utah 405, 64 P.2d 351, 361 (1937).

**42.** 21 Utah 2d 289, 445 P.2d 1 (1968).

it, and it must be distinctly made, although it may be express or implied.

Similar language is found in *Bjork v. April Industries, Inc.,*[43] where this Court held that waiver must be intentional relinquishment of a known right.

■ Defendants' claim of waiver is based upon the same facts alleged as supportive of their estoppel argument. Again, we do not find adequate support in these facts, or elsewhere in the record, for the imposition of the doctrine of waiver. Notwithstanding plaintiff's delay in asserting his claim and his acknowledgement of and compliance with the provisions of the will, he did not at any time intentionally and distinctly relinquish his right to assert a claim of ownership against the property. Furthermore, it is noted that plaintiff's actions herein were accomplished well within the appropriate statute of limitations.

Plaintiff has raised two points of contention on cross-appeal, one of which has been dealt with and resolved previously in this opinion under defendants' Point III.[44] The remaining contention raised by plaintiff is that evidence improperly excluded under the dead man's statute[45] established an oral trust between plaintiff and his deceased wife in connection with the marital estate.

Plaintiff's challenge to the propriety of the trial court's employment of the dead man's statute is grounded upon two arguments: 1) defendants waived their right to the provisions of said statute; and 2) the statute is inapplicable to this case.

■ With respect to the first argument (waiver), it is plaintiff's position that defendants' failure to enter an objection when he first took the witness stand and before he gave any testimony, resulted in a waiver of their right to invoke the dead man's statute. In other words, he claims that once he testified, the dead man's statute

was waived. This position allegedly rests upon the following rule stated by this Court in the case of *Obradovich v. Walker Brothers Bankers:*[46]

> The rule is well settled that a party desiring the protection of the statute here invoked by the appellant must make a proper and seasonable objection to the competency of the witness. Under the statute it is the witness and not the proffered testimony which is incompetent. Therefore, the objection must be specifically directed to the incompetency of the witness and not to the proffered testimony.

We do not agree with this argument, nor do we view the *Obradovich* case as supportive thereof. It is well settled in this jurisdiction that a witness who is incompetent to testify to some matters because of the dead man's statute may properly testify concerning other matters. We so held in *Dallof v. Robinson:*[47]

> This [dead man's] statute does not mean that a party may not be called to testify to matters not pertaining to transactions with the deceased without opening up the matter so that the survivor may testify to forbidden transactions.

Furthermore, in the case of *Burk v. Peter,*[48] the Court held that a party may testify concerning some transactions with the decedent, where as to such transactions the dead man's statute had been previously waived, yet the same witness could be excluded from testifying to other transactions with the decedent which were not subject to the waiver. Obviously, under the *Burk* decision, a witness is competent to testify to transactions not covered by the dead man's statute, and yet can be excluded from testifying to matters covered by the statute.

Plaintiff's reliance upon the *Obradovich* decision for the proposition that one must object to a witness's competency prior to

---

**43.** Utah, 547 P.2d 219 (1976).

**44.** Under defendants' Point III, we resolved plaintiff's assertion of entitlement to increased damages.

**45.** U.C.A., 1953, § 78–24–2(3).

**46.** 80 Utah 587, 16 P.2d 212 (1932).

**47.** Utah, 520 P.2d 191, 193 (1974).

**48.** 115 Utah 58, 202 P.2d 543, 544–45 (1949).

any testimony is misplaced. In *Obradovich,* an objection was made against certain testimony on grounds that it was "irrelevant and immaterial, self-serving declarations on the part of the deceased."[49] The trial court overruled the objection on those grounds and allowed the testimony. The dead man's statute was raised for the first time on appeal.

In view of these particular circumstances, the Court made the statement (above) relied upon by plaintiff, and further observed:

It will be observed that the objection made only goes to the testimony which might be responsive to the question to which the objection was made. In this connection it should also be noted that no objection was interposed to the competency of the witness. The objection being overruled, the appellant is entitled to a review of the ruling only upon the grounds stated and pointed out by his objection, which were irrelevancy and immateriality and "self serving statements on the part of the deceased." The objection was properly overruled, for the proffered evidence was both relevant and material.[50]

It is the opinion of the Court that the language from the *Obradovich* decision relied upon by plaintiff, when considered in its true context, is not supportive of plaintiff's position.

As noted above, plaintiff also argues that the dead man's statute is not applicable to this case. Again, we must disagree. The statute provides, in pertinent part:

The following persons cannot be witnesses:

. . . .

(3) a party to any civil action . . . and any person directly interested in the event thereof . . . when the adverse party in such action . . . claims or opposes, sues or defends . . . as the executor . . . of any deceased person, . . . as to any statement by or transaction with, such deceased . . . person . . . which must have been equally within the knowledge of both the witness and such . . . deceased person unless . . . called to testify thereto by [the executor].[51]

Its scope of application has been described by this Court as follows:

When an executor, etc., sues or defends in an action to protect or recover assets of the estate, neither the other party to the action, nor the person through whom he claims or deraigns his title, nor any other person having a direct interest in the claim of the party opposing the executor, etc., that is, an interest in the cause of action, adverse to the claims of the executor, can testify as to any transaction had with the deceased, which is involved in the lawsuit, nor as to any statement made by the deceased relative to the transactions, matters and claims involved in the lawsuit, unless such person is called to so testify by the executor, etc.[52]

Clearly, therefore, its employment in the present case is proper.

In light of our disposition of the foregoing issues, we affirm the trial court's judgment in all aspects, with the exception of the amount of the award to plaintiff. We therefore vacate that particular aspect of the judgment and remand for the purpose of making a redetermination of the award and adequate findings in support thereof.

STEWART and DURHAM, JJ., and PETER F. LEARY, District Judge, concur.

OAKS, J., having disqualified himself, does not participate herein; LEARY, District Judge, sat.

HOWE, Justice (dissenting):

This case is controlled by the rule of law stated in Section 442 of the Restatement of Trusts 2d (1959), which reads as follows at p. 402:

**49.** 16 P.2d at 218.

**50.** *Id.*

**51.** *Supra* n. 45.

**52.** *Maxfield v. Sainsbury,* 110 Utah 280, 172 P.2d 122, 125 (1946).

Where a transfer of property is made to one person and the purchase price is paid by another and the transferee is a wife, child or other natural object of bounty of the person by whom the purchase price is paid, a resulting trust does not arise unless the latter manifests an intention that the transferee should not have the beneficial interest in the property.

We recognized and applied the rule in *Anderson v. Cercone,* 54 Utah 345, 180 P. 586 (1919). In Comment A to Section 443 at p. 404, it is stated that it is the intention of the payor at the time of the transfer, and not at a later time, which determines whether a resulting trust arises. "The conduct of the payor and of the transferee subsequent to the transfer, however, may be such as to show that at the time of the transfer the payor did not intend to make a gift to the transferee."

The plaintiff's case must rise or fall by the application of the foregoing rule of law. If the evidence does not support a finding by clear and convincing evidence that the plaintiff manifested an intention that his wife should not have the beneficial interest in each piece of property as it was acquired, thereby rebutting the inference of a gift, the plaintiff is entitled to no relief. A constructive trust does not arise under those circumstances and the majority opinion is in error in so holding. The law presumes that a gift was intended and unless that inference is rebutted, a resulting trust does not arise because the payor gave the transferee the full beneficial interest. That being so, a constructive trust cannot arise either since the payor reserved no equitable interest to himself as the majority opinion maintains.

In the recent case of *In the Matter of the Estate of Ruth M. Hock, Deceased, v. Fennemore,* Utah, 655 P.2d 1111 (1982), Jack Fennemore brought suit against the personal representative of his sister's estate to impress a purchase money resulting trust upon certain real estate to the purchase of which he claimed to have contributed. Although title had been taken in the name of the deceased, the trial court impressed a constructive trust upon the property. On appeal to this Court we held that a purchase money resulting trust arose under those circumstances and not a constructive trust. Since the payor and the transferee were siblings (and not husband and wife as in the instant case), Section 442 was not applicable. Instead, Sections 440 and 441 controlled, raising a rebuttable inference that no gift was intended and thus a resulting trust arose in favor of the payor (Jack). We affirmed the trial court's finding by clear and convincing evidence that a resulting trust arose in favor of Jack. The Supreme Court of California refused to impress a constructive trust in *Altramano v. Swan,* 20 Cal.2d 622, 128 P.2d 353 (1942), where it stated "a constructive trust does not arise upon the transfer of property from a husband to a wife without consideration." The court held that the rule found in Section 442 of the Restatement of Trusts was controlling, citing many earlier decisions of that court.

The rule stated in Section 442 that a donative intent is presumed has universally been followed by the courts in this country, both prior to and since the promulgation of the Restatement of Trusts. For cases relying on the rule in husband to wife transfers (and sometimes broadening the rule to wife to husband transfers) see *Anderson v. Cercone,* supra; *Blaine v. Blaine,* 63 Ariz. 100, 159 P.2d 786 (1945); *Peterson v. Massey,* 155 Neb. 829, 53 N.W.2d 912 (1952); *Nussbacher v. Manderfeld,* 64 Wyo. 55, 186 P.2d 548 (1947); *Tarkington v. Tarkington,* 45 N.C.App. 476, 263 S.E.2d 294 (1980); *Walter v. Home National Bank & Trust Co. of Meriden,* 148 Conn. 635, 173 A.2d 503 (1961); *Scanlon v. Scanlon,* 6 Ill.2d 224, 127 N.E.2d 435 (1955); *Norman v. Kernan,* 226 Wis. 78, 276 N.W. 127 (1937); *Scott v. Currie,* 7 Wash.2d 301, 109 P.2d 526 (1941); *Altramano v. Swan,* supra. See Bogert, Trusts and Trustees, 2d Ed., § 459 (1977); Scott on Trusts, Vol. 5, § 442 (1967).

The same rule that infers a gift likewise applies to the improvements made to the several properties by the labor and money of the plaintiff. *Aycock v. Bottoms,* 201

Ark. 104, 144 S.W.2d 43 (1940); *Hoef v. Hoef,* 323 Ill. 170, 153 N.E. 658 (1926); *Lewis v. Bowman,* 113 Mont. 68, 121 P.2d 162 (1942), overruled on another ground, Mont., 495 P.2d 591 (1972).

The majority opinion grants relief to the plaintiff under Section 160 of the Restatement of Restitution (1937), which states at p. 640:

> Where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it, a constructive trust arises.

That rule of law does not here apply because the law infers that a gift was intended by the plaintiff when he placed title to the property in his wife's name. Unless he can rebut that inference, which he failed to do here, he has no equitable or beneficial interest because he reserved none. His wife's estate is under no equitable duty to convey it to him; nor is her estate unjustly enriched by retaining it. The donee of a gift is always enriched thereby but no one would claim that he is unjustly enriched. See *Kohr v. Kohr,* 271 Pa.Super. 321, 413 A.2d 687 (1979), where the court rejected the application of Section 160 of the Restatement of Restitution when the evidence did not rebut the inference of a gift from mother to son, and establish that a resulting trust was intended by her.

At the trial the defendant moved to dismiss the plaintiff's case on several grounds, including that the evidence did not establish a resulting trust. The trial court apparently granted the motion as to a resulting trust, but made no written finding of fact as to whether the inference of a gift had been overcome. In his bench ruling, which apparently granted the defendant's motion to dismiss as regards a resulting trust, the court said:

> ... but a resulting trust does not result merely because the husband puts up the money to purchase property in his wife's name. Mr. Park's testimony, as I recall it, with regard to why this was done, even when they were younger and first started to acquire property, apparently

the decision was made by the two of them that he was going to die first. And therefore, they ought to put all of the property in her name. I think that I paid some attention to that because to me it's quite important as to the reason that it was done.

I interpret that statement of the trial judge to mean that he concluded that Mr. Park intended that his wife should have the full beneficial interest in the several properties, since both he and she believed that he would die first. This assumption was based on the fact that he was in poor and frail health. Having so ruled, and having failed to make a finding of fact that the inference of a gift was rebutted, the trial court should have dismissed the plaintiff's complaint and not granted him relief under inapplicable rules governing constructive trusts.

The majority opinion cites two cases in support of imposing a constructive trust but those cases are distinguishable. *Yohe v. Yohe,* 466 Pa. 405, 353 A.2d 417 (1976) involved a husband suing his wife to set aside a deed which he signed conveying to her his interest in their jointly held residence. He claimed that he signed the deed believing it was a new deed they were getting as a consequence of their paying the mortgage in full. The court held that it was a question of fact whether a confidential relationship between husband and wife existed which would have required her to disclose material facts concerning the deed. The court remanded the case for a full evidentiary hearing on that question. Obviously, the case dealt with an entirely different problem than we have in the instant case. *Adams v. Jankouskas,* Del.Supr., 452 A.2d 148 (1982) involved a similar fact situation to our case. The court affirmed a lower court finding that the husband turned over his earnings to his wife "in obvious trust" because they had agreed that the survivor of them should have everything. The rule of Section 442 of the Restatement of Trusts 2d was not mentioned, but the lower court's finding that a trust was intended supported its imposition of a "constructive or resulting

trust" (without deciding which). A similar finding in the instant case that a trust was intended is completely lacking. In fact, the trial court's bench ruling is to the contrary—that no trust was intended. There was no agreement here between Mr. and Mrs. Parks that the survivor was to have everything.

If this case is to be remanded to the trial court for the purpose of making adequate findings as to the value of plaintiff's equitable interest in his wife's estate as directed in the majority opinion, two important considerations should be observed upon remand:

First, the trial court should segregate those properties which were purchased with funds contributed either wholly or in part by Mr. Park from those properties which were acquired by inheritance or gift from Mrs. Parks' mother or her estate. As to the latter properties, there is no basis in the law whatever for imposing any kind of a trust on them, even under plaintiff's theory. Furthermore, as to the property which they originally took title to in their names as joint tenants but which Mr. Parks afterwards quitclaimed to her, no constructive trust would arise except under the circumstances stated in Section 44 of the Restatement of Trusts 2d where the transferee agrees to hold the property, or an interest therein, for the benefit of the transferor.

Secondly, in any property in which a constructive or resulting trust has arisen, the trial court should determine the extent of the interest which is subject to the trust. Although Mrs. Parks did not work outside of the home and had no income from employment, she contributed her full time and labor to the maintenance of the home and the small orchard and farm surrounding it. If Mr. Parks did not intend that she have the full beneficial interest in the properties to which he provided the purchase money, it is difficult for me to believe that he intended that she was not to have at least a half interest therein. Under that view of the evidence, a trust should not be imposed on more than one-half of the property. Her one-half should be free for her to dispose of by will as she saw fit. Comment B to Section 443 of the Restatement of Trusts 2d (1954) states at p. 404:

> Where one person pays the purchase price for property which is transferred at his direction to another who is a natural object of his bounty, and it is shown that the payor intended to have a partial interest in the property, a resulting trust arises in favor of the payor as to such interest but only as to such interest.

Accord: *Dougherty v. Duckworth,* Mo., 388 S.W.2d 870 (1965).